1  Judith A. Zipkin, Esq. (SBN 118449)
2  jzipkin@foleymansfield.com
   Joseph V. Macha, Esq. (SBN 176538)
3  jmacha@foleymansfield.com
4  **Foley & Mansfield, PLLP**
   300 South Grand Avenue, Suite 2800
5  Los Angeles, CA 90071
6  Telephone:   (213) 283-2100
   Facsimile:   (213) 283-2101
7
8  Attorneys for Defendant
   **GE AVIATION SYSTEMS, LLC**
9
10
11              **UNITED STATES DISTRICT COURT**
12      **CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**
13
14
15
16  CORONA DOLPHIN, L.P., A          ) Case No:
    California limited partnership,   )
17                                    )
18              Plaintiff,            ) **NOTICE OF REMOVAL OF**
                                      ) **ACTION UNDER 28 U.S.C. § 1441**
19        vs.                         ) **(DIVERSITY)**
                                      )
20  GE AVIATION SYSTEMS, LLC, a       ) Trial Date: None
21  Delaware limited liability company: )
    DOES 1 through 20, inclusive,     )
22                                    )
23              Defendants.           )
                                      )
24  _____  )
25
26  **TO THE CLERK OF THE ABOVE-REFERENCED COURT:**
27        **PLEASE TAKE NOTICE** that Defendant GE AVIATION SYSTEMS,
28  LLC ("DEFENDANT") hereby removes to the United States District Court,

                                    1
                    NOTICE OF REMOVAL OF ACTION

Central District of California, Eastern Division, the state court action styled *"CORONA DOLPHIN, L.P., a California limited partnership, Plaintiff v. GE AVIATION SYSTEMS, LLC, a Delaware limited liability company; DOES 1 through 20, inclusive, Defendants,"* bearing Case No. RIC 1401377, which action was filed in the Superior Court of the State of California in and for the County of Riverside on February 13, 2014 and served on DEFENDANT on February 20, 2014.

## GROUNDS FOR REMOVAL

1.      This Court has original jurisdiction of this action under 28 U.S.C. § 1332, on the basis of diversity, and this action may be removed by DEFENDANT pursuant to 28 U.S.C. § 1441 in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

2.      On February 13, 2014, Plaintiff Corona Dolphin L.P., a California limited partnership ("PLAINTIFF") commenced an action in the Superior Court of the State of California in and for the County of Riverside, styled, *"CORONA DOLPHIN, L.P., a California limited partnership, Plaintiff v. GE AVIATION SYTEMS, LLC, a Delaware limited liability company; DOES 1 through 20, inclusive, Defendants,"* bearing Case No. RIC 1401377. A true and correct copy of the Complaint, and all other papers, process, pleadings and orders served upon DEFENDANT, is attached hereto as "Exhibit A."

3.      The Complaint alleges one cause of action against DEFENDANT. The first cause of action is for breach of written lease and is asserted by plaintiff Corona Dolphin, L.P., a California limited partnership ("PLAINTIFF").

4.      PLAINTIFF served the complaint upon DEFENDANT on February 20, 2014. A true and correct copy of the Proof of Service – Summons & Complaint is attached hereto as "Exhibit B."  This Notice of Removal is timely filed pursuant to 28 U.S.C. 1446(b) since it is filed within 30 days of service of the Summons and

2

1  Complaint on DEFENDANT.

## DIVERSITY JURISDICTION

5.    This case may be removed pursuant to 28 U.S.C. § 1441(a) because there exists complete diversity between PLAINTIFF and DEFENDANT, and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332.

6.    Upon information and belief, PLAINTIFF is a citizen of the State of California.  Complaint ¶ 1.

7.    DEFENDANT is a citizen of Delaware. Complaint, ¶2.

8.    The citizenship of Defendant Does 1 to 20 is disregarded for removal purposes.  28 U.S.C. §1441(b)(1).

9.    There exists complete diversity because PLAINTIFF and DEFENDANT are citizens of different states.

10.   The amount in controversy necessary to establish jurisdiction under 28 U.S.C. § 1332 is met because PLAINTIFF alleges damages of "hundreds of thousands of dollars".  Complaint, Preface.

## VENUE

11.   28 U.S.C. §1441(a) provides that "any civil action brought in a State may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action was pending."

///
///
///

12.     PLAINTIFF filed this action in the Superior Court for the County of Riverside. According to 28 U.S.C. §84(c)(2), this Court embraces the Superior Court for the County of Riverside and therefore is the proper Court for the removal of this action.

DATED: March 21, 2014                    FOLEY & MANSFIELD, PLLP

By:  _Judith A. Zipkin_____

Judith A. Zipkin
Attorneys for Defendant
**GE AVIATION SYSTEMS, LLC**

NOTICE OF REMOVAL OF ACTION

**EXHIBIT A**

FEB 2 0 2014 @ 3:30

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
GE AVIATION SYSTEMS, LLC, a Delaware limited liability company;
DOES 1 through 20, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CORONA DOLPHIN, L.P., a California limited partnership,

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

FEB 1 3 2014

R. Mc Elyea

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| | |
|---|---|
| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* Riverside County Superior Court <br> Riverside Court: 4050 Main Street, Riverside, CA 92501 | CASE NUMBER: <br> *(Número del Caso):* <br> **RIC 1401377** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Gary J. Gorham, Richardson & Patel, LLP, 1100 Glendon Ave., Ste. 850, L.A., CA 90024 (310) 208-1182

| DATE: <br> *(Fecha)* FEB 1 3 2014 | Clerk, by **R. Mc Elyea** <br> *(Secretario)* | , Deputy <br> *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* GE AVIATION SYSTEMS, LLC, a Delaware limited liability company

   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☒ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☒ by personal delivery on *(date):* FEB 2 0 2014

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]
**SUMMONS**
Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE

RI-030

☐ BANNING 135 N. Alessandro Rd., Banning, CA 92220
☐ BLYTHE 265 N. Broadway, Blythe, CA 92225
☐ HEMET 880 N. State St., Hemet, CA 92543
☐ MORENO VALLEY 13800 Heacock St., Ste. D201, Moreno Valley, CA 92553
☐ MURRIETA 30755-D Auld Rd., Suite 1226, Murrieta, CA 92563
☐ PALM SPRINGS  3255 E. Tahquitz Canyon Way, Palm Springs, CA 92262
☒ RIVERSIDE 4050 Main St., Riverside, CA 92501
☐ TEMECULA 41002 County Center Dr., #100, Temecula, CA 92591

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar Number and Address):
Gary J. Gorham (SBN: 171061)
RICHARDSON & PATEL, LLP
1100 Glendon Avenue, Suite 850
Los Angeles, CA 90024
TELEPHONE NO: (310) 208-1182     FAX NO. (Optional): (310) 208-1154
E-MAIL ADDRESS (Optional): ggorham@richardsonpatel.com
ATTORNEY FOR (Name): Plaintiff Corona Dolphin, L.P.

FOR COURT USE ONLY

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

FEB 13 2014

R. Mc Elyea

PLAINTIFF/PETITIONER: Corona Dolphin, L.P.

DEFENDANT/RESPONDENT: GE Aviation Systems, LLC

CASE NUMBER:
RIC  1401377

CERTIFICATE OF COUNSEL

The undersigned certifies that this matter should be tried or heard in the court identified above for the reasons specified below:

☒  The action arose in the zip code of: 92880

☒  The action concerns real property located in the zip code of: 92880

☐  The Defendant resides in the zip code of: _____

For more information on where actions should be filed in the Riverside County Superior Courts, please refer to Local Rule 1.0015 at www.riverside.courts.ca.gov.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date  02/12/14

Gary J. Gorham/Attys for Plaintiff Corona Dolphin LP
(TYPE OR PRINT NAME OF ☒ ATTORNEY ☐ PARTY MAKING DECLARATION)

► _____
(SIGNATURE)

Approved for Optional Use
Riverside Superior Court
RI-030 (Rev. 09/15/13)

CERTIFICATE OF COUNSEL

Page 1 of 1
Local Rule 1.0015
riverside.courts.ca.gov/localforms/localforms.shtml

ORIGINAL COPY

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Gary J. Gorham (SBN: 171061)
RICHARDSON & PATEL, LLP
1100 Glendon Avenue, Suite 850
Los Angeles, CA 90024
TELEPHONE NO. (310) 208-1182    FAX NO. (310) 208-2254
ATTORNEY FOR *(Name):* Plaintiff Corona Dolphin, L.P.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
STREET ADDRESS: 4050 Main Street
MAILING ADDRESS:
CITY AND ZIP CODE: Riverside, CA 92501
BRANCH NAME: Riverside Court - Civil Dept. Courthouse

CASE NAME:
Corona Dolphin, L.P. vs. GE Aviation Systems, LLC

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 140377 |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000)   [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | RIC **1401377**<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

**1.** Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[✓] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

**2.** This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply):* a. [✓] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [ ] punitive
**4.** Number of causes of action *(specify):* One
**5.** This case [ ] is [✓] is not a class action suit.
**6.** If there are any known related cases, file and serve a notice of related case: *(You may use form CM-015.)*

Date: February 12, 2014
Gary J. Gorham
_____
(TYPE OR PRINT NAME)        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
4050 Main Street - 2nd Floor
Riverside, CA  92501
www.riverside.courts.ca.gov

NOTICE OF DEPARTMENT ASSIGNMENT FOR CASE MANAGEMENT PURPOSES
AND CASE MANAGEMENT CONFERENCE (CRC 3.722)

CORONA DOLPHIN, LP VS. GE AVIATION SYSTEMS, LLC

CASE NO. RIC1401377

This case is assigned to the Honorable Judge John D. Molloy in Department 10 for case management purposes. The Case Management Conference is scheduled for 08/12/14 at 8:30 in Department 10.

Case is Assigned to Department 03 for Law and Motion Purposes.

The plaintiff/cross-complainant shall serve a copy of this notice on all defendants/cross-defendants who are named or added to the complaint and file proof of service.
Any disqualification pursuant to CCP section 170.6 shall be filed in accordance with that section.

Requests for accommodations can be made by submitting Judicial Council form MC-410 no fewer than five court days before the hearing. See California Rules of Court, rule 1.100.

CERTIFICATE OF MAILING

I certify that I am currently employed by the Superior Court of California, County of Riverside, and that I am not a party to this action or proceeding. In my capacity, I am familiar with the practices and procedures used in connection with the mailing of correspondence. Such correspondence is deposited in the outgoing mail of the Superior Court. Outgoing mail is delivered to and mailed by the United States Postal Service, postage prepaid, the same day in the ordinary course of business. I certify that I served a copy of the foregoing NOTICE on this date, by depositing said copy as stated above.

Court Executive Officer/Clerk

Date: 02/13/14                                     by: _____
                                                          RICQUEL L MCELYEA, Deputy Clerk

CDACMC
1/28/14

1  Gary J. Gorham (SBN 171061)
   ggorham@richardsonpatel.com
2  Eric Ashton Puritsky (SBN 239577)
   epuritsky@richardsonpatel.com
3  RICHARDSON & PATEL, LLP
   1100 Glendon Avenue, Suite 850
4  Los Angeles, California 90024
   Telephone: (310) 208-1182
5  Facsimile:  (310) 208-1154

6
   Attorneys for Plaintiff
7  CORONA DOLPHIN, L.P.

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF RIVERSIDE

11                                                    140|377
   CORONA DOLPHIN, L.P., a California limited      Case No.:    RIC  1401337
12 partnership,

13                                         COMPLAINT FOR BREACH OF
             Plaintiff,                    CONTRACT
14
                   v.                      DEMAND FOR JURY TRIAL
15
16 GE AVIATION SYSTEMS, LLC, a Delaware
   limited liability company; DOES 1 through 20,
17 inclusive,

18          Defendants.

19

20
        Plaintiff CORONA DOLPHIN, L.P. ("Corona Dolphin") seeks relief from damages arising
21
   from the contamination of Corona Dolphin's real property by defendant GE AVIATION SYSTEMS,
22
   LLC ("GE Aviation") and its predecessors.  GE Aviation and its predecessors-in-interest occupied
23
   Corona Dolphin's real property in Corona, California for ten years, pursuant to a written lease that
24
   required GE Aviation to return the land in the same condition it was in at the commencement of the
25
   lease. Instead, GE Aviation returned the property contaminated with jet fuel substitutes used by GE
26
   Aviation and its predecessors while they occupied the Property.  GE Aviation refused to clean up the
27
   property, and refused to reimburse Corona Dolphin for any portion of the hundreds of thousands of
28
   dollars Corona Dolphin spent to do so.

                                    1
                               COMPLAINT

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

FEB 18 2014

R. Mc Elyea

**THE PARTIES**

1.     Plaintiff Corona Dolphin is a limited partnership organized and existing under the laws of the State of California, with its principal place of business located in Irvine, California. Corona Dolphin is, and at all relevant times was, the owner of that certain real property located at 550 Monica Circle, Corona, California.

2.     Corona Dolphin is informed and believes, and on that basis alleges, that Defendant GE Aviation is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Schenectady, New York.

3.     The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants named Does 1 through 20, inclusive, are unknown to Corona Dolphin, who therefore sues such defendants by such fictitious names. Corona Dolphin is informed and believes, and on that basis alleges that defendants Does 1 through 20, inclusive, are in some manner responsible and/or liable for the damages and/or action alleged herein. Corona Dolphin will seek leave of this Court to amend this Complaint to show their true names and capacities once they are discovered.

**JURISDICTION AND VENUE**

4.     The acts, transactions and occurrences giving rise to this action occurred in substantial part in Corona, California, and involved real property located within the City of Corona, County of Riverside, State of California.

5.     Corona Dolphin and the predecessor-in-interest to GE Aviation entered into a written agreement, under which they agreed that any litigation between the parties relating to the real property in question would take place in Riverside County.

**STATEMENT OF FACTS**

6.     At all relevant times, Corona Dolphin owned that certain real property located at 550 Monica Circle in Corona, California ("the Property").

7.     As of February 1, 2003 Corona Dolphin entered into a lease with Smiths Aerospace, Inc., a Delaware corporation ("Smiths Aerospace"), under which Smiths Aerospace leased the Property for a ten-year term.  In addition to the language contained in the Standard Industrial/Commercial Single-Tenant Lease, Corona Dolphin and Smiths Aerospace negotiated and

1   agreed upon a sixteen page Addendum. The Standard Industrial/Commercial Single-Tenant Lease

2   and Addendum are collectively referred to herein as the "Lease." A true and correct copy of the

3   Lease is attached as Exhibit A.

4       8.    Paragraph 63 of the Lease specifically addresses an outdoor testing facility that Smiths

5   Aerospace constructed on the Property:

6       "Lessee shall have sole responsibility for such outdoor testing facility in all respects.

7       Upon the expiration or earlier termination of this Lease, Lessee at its sole cost and

8       expense shall remove such facility, repair any damage caused by such facility, and

9       restore the affected area of the Premises to the same condition that existed prior to

10      installation of such facility."

11      9.    Paragraph 6.2(c) of the Lease addresses the release of Hazardous Substances on the

12  Property:

13      "Lesse shall not cause or permit any Hazardous Substance to be spilled or released in, or

14      under, or about the Premises . . . and shall promptly, at Lessee's expense, take all

15      investigatory action reasonably recommended, whether or not formally required, for the

16      cleanup of any contamination . . . the Premises . . . that was caused by or materially

17      contributed to by Lessee."

18      10.    Paragraph 6.2(h) of the Lease requires Smith Aerospace and its successor GE Aviation

19  to reimburse Corona Dolphin for the costs of remediating environmental contamination caused by the

20  tenant as recommended by any Phase 2 environmental study.

21      "Nothing herein precludes Lessor from obtaining, at its own cost, any Phase 2 Work

22      recommended in any Phase 1 assessment or otherwise (and if any such Phase 2 work reveals

23      environmental contamination for which Lessee is responsible under the Lease, Lessee shall

24      reimburse Lessor for the reasonable cost of such Phase 2 work)."

25      11.    Paragraph 6.3(d) of the Lease addresses the obligation of Smiths Aerospace and its

26  successor GE Aviation to indemnify Corona Dolphin for costs and fees relating to contamination of

27  the Property:

28

"Lessee shall indemnify, defend and hold Lessor . . . harmless from and against any and all loss of rents and/or damages, . . . expenses, . . . and attorneys' fees and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises during the term of this Lease by or for Lessee. . . .   Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease."

12.      Paragraph 31 of the Lease specifies that in any action filed to enforce the terms of the Lease, the prevailing party shall be entitled to reimbursement all attorneys' fees reasonably incurred.

13.      Smiths Aerospace occupied the Property starting in or around February 2003.

14.      In or around July 2004 Smiths Aerospace assigned its interest in and obligations under the Lease to Smiths Aerospace, LLC, a Delaware limited liability corporation.  Corona Dolphin provided written consent to the assignment.

15.      Corona Dolphin is informed and believes and based there on alleges that in or around January 2007 Smiths Aerospace, LLC was sold to General Electric for a reported sales price of $4.8 billion. As a result of the transaction, Smiths Aerospace became an operating subsidiary of GE Aviation, and GE Aviation stepped into Smiths Aerospace's rights and obligations under the Lease.

16.      GE Aviation occupied the Property until the termination of the Lease on January 31, 2013.

17.      Corona Dolphin is informed and believes, and on that basis alleges that during the time the Property was occupied by Smiths Aerospace, Smith Aerospace, LLC and GE Aviation, one, some or all of the tenants caused hazardous substances, including but not limited to jet fuel substitutes, to be released onto the Property, resulting in contamination of the soil and subsoil at the Property.

18.      After GE Aviation vacated the Property, Dolphin Corona retained Green Environmental Management ("GEM") to prepare a Phase I Environmental Site Assessment dated as of July 11, 2013 (the "Phase I Report").  The Phase I Report concluded that there were "recognized environmental conditions" at the Property, in particular at the location of the outdoor testing facility.

1   At GEM's recommendation, Dolphin Corona commissioned a Phase II environmental study (the

2   "Phase II Report"), which recommended that the impacted soil be excavated and removed from the

3   Property.

4       19.    Based on the recommendations in the Phase II Report, Corona Dolphin approved a

5   Site Mitigation Workplan, pursuant to which Corona Dolphin paid to remove and dispose of 50,000

6   cubic feet of soil impacted by extractable fuel hydrocarbons.

7       20.    GE Aviation has refused to pay for any portion of the costs associated with Corona

8   Dolphin's remediation.

9   **FIRST CAUSE OF ACTION**

10  (Breach of Written Lease)

11  *(by Corona Dolphin against GE Aviation and Does 1 through 20)*

12      21.    Corona Dolphin re-alleges, and incorporates herein by reference as though set forth in

13  full, the allegations contained in paragraphs 1 through 20 of this Complaint.

14      22.    On or about February 1, 2003 Corona Dolphin and Smiths Aerospace entered into the

15  Lease. Smiths Aerospace's rights and obligations under the Lease later were assumed by GE

16  Aviation.

17      23.    Corona Dolphin performed all conditions, covenants, and promises required on its

18  part to be performed in accordance with the terms and conditions of the Lease.

19      24.    GE Aviation breached the Lease by (a) failing to return the Property in the condition

20  it was in upon initiation of the Lease; (b) permitting a hazardous substance or substances to be

21  spilled on the Property; (c) failing and refusing to undertake at its own cost a remediation of the

22  Property; and (d) failing and refusing to indemnify Corona Dolphin for the costs of undertaking

23  environmental impact studies and recommended remediation.

24      25.    As a direct and proximate result of these breaches, Corona Dolphin has suffered

25  damages in excess of the jurisdictional minimum of this Court.

26      26.    In addition to damages, Corona Dolphin is entitled to recoup its attorneys' fees in this

27  action.

28

5<br>COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Corona Dolphin prays for judgment against Defendants, and each of them, as follows:

1. Actual and consequential damages according to proof;

2. Attorneys' fees;

3. Pre-judgment and post-judgment interest;

4. Costs of suit; and

5. Such other and further relief as the Court deems necessary and appropriate.

DATED: February 13, 2014

RICHARDSON & PATEL, LLP

By _____
Gary J. Gorham
Attorneys for Plaintiff CORONA DOLPHIN, L.P.

1

## DEMAND FOR JURY TRIAL

2      Plaintiff CORONA DOLPHIN, L.P. hereby demands a jury trial of all issues that may be tried

3  by jury.

4

5  DATED:. February 13, 2014                    RICHARDSON & PATEL, LLP

6                                              By _____
                                                  Gary J. Gorham
7                                              Attorneys for Plaintiff CORONA DOLPHIN, L.P.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **EXHIBIT A**



**AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION**

## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET

### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

**1.     Basic Provisions ("Basic Provisions").**

1.1     **Parties:** This Lease ("Lease"), dated for reference purposes only,     as of February 1,                        , 2003, is made by and between Corona Dolphin, L.P., a California limited partnership

("Lessor") and

Smiths Aerospace, Inc., a Delaware corporation

("Lessee"),

(collectively the "Parties," or individually a "Party").

1.2     **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, and commonly known as     550 Monica Circle, Corona, CA   92880-5447 (formerly 550 Bearing Circle)         , located in the County of     Riverside                 , State of     California             , and generally described as (describe briefly the nature of the property and, if applicable, the "Project", if the property is located within a Project) See Addendum,     Paragraph 1.2

("Premises").  (See also Paragraph 2)

1.3     **Term:**   Ten (10) years and   Zero (0) months ("Original Term") commencing     February 1, 2003 ("Commencement Date") and ending     January 31, 2013                 ("Expiration Date").  (See also Paragraph 3 and Addendum, Paragraph 1.3)

1.4     **Early Possession:**     See Addendum, Paragraph 1.4                        ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

1.5     **Base Rent:** $  68,471.80 per month ("Base Rent"), payable on the     first                     day of each month commencing     February 1, 2003                                        .  (See also Paragraph 4 and Addendum, Paragraph 1.5 )

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted.

1.6     **Base Rent Paid Upon Execution:** $     68,471.80 as Base Rent for the period     February 1-28, 2003

1.7     **Security Deposit:** $     None.     See Addendum, Paragraph 1.7     ("Security Deposit"). (See also Paragraph 5)

1.8     **Agreed Use:** manufacturing, warehousing, assembly, testing and distribution of equipment, and general office use in support thereof                             (See also Paragraph 6)

1.9     **Insuring Party:** Lessor is the "Insuring Party" unless otherwise stated herein.  (See also Paragraph 8)

1.10   **Real Estate Brokers:** (See also Paragraph 15)
(a) **Representation:** The following real estate brokers (collectively, the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

☐     N/A                                                                                         represents Lessor exclusively ("Lessor's Broker");

☐     N/A                                                                                         represents Lessee exclusively ("Lessee's Broker"); or

☑     Collins Commercial Corporation                                            represents both Lessor and Lessee ("Dual Agency").

(b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to in their separate written agreement (or if there is no such agreement, the sum of     N/A    % of the total Base Rent for the brokerage services rendered by said Broker).

1.11   **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by None

("Guarantor").  (See also Paragraph 37)

1.12   **Addenda and Exhibits.** Attached hereto is an "Addendum to Standard Industrial/Commercial Single-Tenant Lease" & Addenda consisting of Paragraphs           through           and Exhibits     "A", "B",  "C" and Schedule 51 ;  Addendum to Lease , all of which constitute a part of this Lease.

**2.     Premises.**

2.1     **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating rental, is an approximation which the Parties agree is reasonable and the rental based thereon is not subject to revision whether or not the actual size is more or less.

2.2     **Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee within thirty (30) days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading and roll-up doors, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date and that the structural elements of the roof, bearing walls and foundation of the Premises (the "Building") shall be free of material defects.  If a non-compliance with said warranty exists as of the Start Date, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify same at Lessor's sole cost and expense.  If, after the Start Date, Lessee does not give Lessor written notice of any non-compliance with this warranty within: (i) one year as to the surface of the roof and the structural portions of the roof, foundations and bearing walls, (ii) nine (9) six (6) months as to the HVAC systems, (iii) nine (9) months thirty (30) days as to the remaining systems and other elements of the Building, correction of such non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense.

2.3     **Compliance.** Lessor warrants that the improvements on the Premises comply with all applicable laws, covenants or restrictions of record, building codes, regulations and ordinances ("Applicable Requirements") in effect on the Start Date. Said warranty does not apply to the use to which Lessee will put the Premises or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the zoning is appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.  If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's sole cost and expense.  If Lessee does not give Lessor written notice of a non-compliance with this warranty within six (6) months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed (as opposed to being in existence at the Start Date, which is addressed in Paragraph 6.2(e) below) so as to require during the term of this Lease the construction of an addition to or an alteration of the Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is

required during the last two (2) years of this Lease. ...ne cost thereof exceeds six (6) months' Base Rent, Le~~s~~ may instead terminate this Lease unless Lessor notifies Lessee, in writing, within ten (10) days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to six (6) months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least ninety (90) days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b) If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then the reasonable out-of-pocket cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay an additional rent, each month during the remainder of the term of this Lease (including any extensions or renewals thereof), on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such Capital Expenditure by a fraction, the numerator of which is one (1), and the denominator of which is the number of months of the useful life of such Capital Expenditure as reasonably estimated by Lessor in accordance with generally accepted accounting principles (including such interest on the unamortized balance as is then commercially reasonably in the judgment of Lessor's accountants), with Lessee reserving the right to prepay its obligation at any time. ~~Lessor and Lessee shall allocate the obligation to pay for such costs pursuant to the provisions of Paragraph 7.1(c);~~ provided, however, that if such Capital Expenditure is required during the last two years of this Lease ~~and the cost thereof exceeds six (6) months Base Rent, or if Lessor reasonably determines that it is not economically feasible to pay the share thereof,~~ Lessor shall have the option to terminate this Lease upon ninety (90) days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within ten (10) days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may (without limiting any other available rights and remedies) advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon thirty (30) days written notice to Lessor.

(c) Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall be fully responsible for the cost thereof, and Lessee shall not have any right to terminate this Lease.

2.4    Acknowledgements. Lessee acknowledges that: (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements), and their suitability for Lessee's intended use; (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises; and (c) neither Lessor, Lessor's agents, nor any Broker has made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (a) Broker has made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises; and (b) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5    Lessee as Prior Owner/Occupant. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

3.    Term.

3.1    Term. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2 ~~Early Possession. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such early possession. All other terms of this Lease (including, but not limited to, the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall, however, be in effect during such period. Any such early possession shall not affect the Expiration Date.~~

3.3 ~~Delay In Possession. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession as agreed, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until it receives possession of the Premises. If possession is not delivered within sixty (60) days after the Commencement Date, Lessee may, at its option, by notice in writing within ten (10) days after the end of such sixty (60) day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said ten (10) day period, Lessee's right to cancel shall terminate. Except as otherwise provided, if possession is not tendered to Lessee by the Start Date and Lessee does not terminate this Lease, as aforesaid, any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession of the Premises is not delivered within four (4) months after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.~~ (See Addendum, Paragraphs 1.3 and 1.4.)

3.4    Lessee Compliance. Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. ~~Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.~~

4.    Rent.

4.1    Rent Defined. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2    Payment. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. Rent for any period during the term hereof which is for less than one (1) full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.

5.    Security Deposit. Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due Lessor or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of said Security Deposit, Lessee shall within ten (10) days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. ~~If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent.~~ Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on said change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within fourteen (14) days after the expiration or termination of this Lease, if Lessor elects to apply the Security Deposit only to unpaid Rent, and otherwise within thirty (30) days after the Premises have been vacated pursuant to Paragraph 7.4(c) below, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease. (See Addendum, Paragraph 17.)

6.    Use.

6.1    Use. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that unreasonably disturbs owners and/or occupants of, or causes damage to neighboring properties. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements on the Premises or the mechanical or electrical systems therein, is not significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within five (5) business days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in use. (See Addendum, Paragraph 6.1.)

6.2    Hazardous Substances.

(a) Reportable Uses Require Consent. The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste

Initials _____  _____

FORM STN-6-2/97E

whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessor shall not unreasonably withhold its consent to Lessee's use of substance or ~Lessee~may~use~any~ordinary~and~customary~ materials containing Hazardous Substances that are reasonably required to be used in the normal course of the Agreed Use, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete enclosures) and/or increasing the Security Deposit. *See Addendum, Paragraphs 6.2(a) and 1.7.*

(b) **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party *(subject to the provisions of Paragraph 6.2(c) of the Addendum).*

**D^t** (d) **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises *during the term of this Lease* by or for Lessee, or any third party *(subject to the provisions of Paragraph 6.2(c) of the Addendum)* provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e) **Lessor Indemnification.** Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which existed as a result of Hazardous Substances on the Premises prior to the Start Date or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Start Date, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in Paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) **Lessor Termination Option.** If a Hazardous Substance Condition occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessee's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds twelve (12) times the then monthly Base Rent or $500,000 ~$100,000,~ whichever is greater, give written notice to Lessee, within thirty (30) days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date sixty (60) days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within ten (10) days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to twelve (12) times the then monthly Base Rent or ~$500,000 $100,000,~ whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within thirty (30) days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination. *See Addendum, Paragraphs 6.2(h) and 6.2(i).*

6.3 **D^t** **Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the *reasonable* recommendations of Lessor's engineers and/or consultants *selected by Lessor and reasonably approved by Lessee (unless Lessor agrees to use Lessee's engineers and/or consultants)* which relate in any manner to the Premises, without regard to whether said requirements are now in effect or become effective after the Start Date. Lessee shall, within ten (10) days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.

6.4 **D^t** **Inspection; Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30 below) and consultants shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times *(with advance written notice, which may be by fax, of at least one business day),* for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a contamination is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the *reasonable out-of-pocket* cost of such inspections, so long as such inspection is reasonably related to the violation or contamination. *See Addendum, Paragraphs 6.4 and 6.5.*

7. **Maintenance; Repairs, Utility Installations; Trade Fixtures and Alterations.**

7.1 **Lessee's Obligations.**

(a) **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance); 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations, and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, *any of* the following items *to the extent that they exclusively serve the Premises:* all equipment or facilities, such as plumbing, heating, ventilating, air-conditioning, electrical, lighting facilities, boilers, pressure vessels, fire protection system, fixtures, walls (interior and exterior), foundations, ceilings, roofs, floors, windows, doors, plate glass, skylights, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located in, *on,* or *on adjacent to* the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. *Except as otherwise specifically provided in this Lease,* Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair. Lessee shall, during the term of this Lease, keep the exterior appearance of the Building in a first-class condition consistent with the exterior appearance of other similar facilities of comparable age and size in the vicinity, including, when

Initials _____ _____

necessary, the exterior repainting of the Building. (See Addendum, Paragraph 50)

(b) **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler, and pressure vessels, (iii) fire extinguishing systems, including fire alarm and/or smoke detection, (iv) landscaping and irrigation systems, (v) roof covering and drains, (vi) driveways and parking lots, (vii) clarifiers (viii) basic utility feed to the perimeter of the Building, and (ix) any other equipment, if reasonably required by Lessor including the existing building emergency generator system so long as Lessee is responsible for the same pursuant to Paragraph 58 of the Addendum (collectively, the "Basic Elements"). See Addendum, Paragraph 7.1(b).

~~(c) Replacement. Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if the Basic Elements described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such Basic Elements, then such Basic Elements shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is the number of months of the useful life of such replacement as such useful life is specified pursuant to Federal income tax regulations or guidelines for depreciation thereof (including straight-line depreciation), without regard to the amortized balance as is then commercially reasonable in the judgment of Lessor's accountant(s), with Lessee reserving the right to prepay its obligation at any time.~~ See Addendum, Paragraph 7.1(c).

**7.2 Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), and except as specifically otherwise provided in this Lease (including the Addendum), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises, or the equipment therein, all of which obligations are intended to be that of the Lessee. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease. See Addendum, Paragraphs 50, 59 and 62.

**7.3 Utility Installations; Trade Fixtures; Alterations.**

(a) **Definitions; Consent Required.** The term "Utility Installations" refers to all floor and window coverings, air lines, power panels, electrical distribution, security and fire protection systems, communication systems, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises, excluding the existing building emergency generator. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a). Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations and Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, and the cumulative cost thereof during this Lease as extended does not exceed $75,000 in the aggregate or $10,000 $75,000 in any one year.

(b) **Consent.** Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. Except at any time that Lessee's tangible net worth in accordance with generally acceptable accounting principles consistently applied ("GAAP") exceeds $50,000,000. For Net worth which costs an amount equal to the greater of one month's Base Rent, or $10,000, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to one and one-half times the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) **Indemnification.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than ten (10) days' notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to one and one-half times the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's reasonable attorneys' fees and costs.

**7.4 Ownership; Removal; Surrender; and Restoration.**

(a) **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per Paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) **Removal.** By delivery to Lessee of written notice from Lessor not earlier than ninety (90) and not later than thirty (30) days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease (other than those items which have been pre-approved by Lessor in writing, and in such approval Lessor has agreed that such items need not be removed upon Lease termination - Lessor agrees to indicate in its approval whether such removal will be required if Lessee requests such information in Lessee's written request for approval). Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent (if consent is required). See Addendum, Paragraph 7.4(b).

(c) **Surrender/Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear damage by casualty or condemnation excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee, and the removal, replacement, or remediation of any soil, material or groundwater contaminated by Lessee (in accordance with Paragraph 6.2). Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

**8. Insurance; Indemnity.** (See Paragraph 50)

**8.1 Payment For Insurance.** Lessee shall pay for all insurance required under Paragraph 8 except to the extent of the cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence. Premiums for policy periods commencing prior to or extending beyond the Lease term shall be prorated to correspond to the Lease term. Payment shall be made by Lessee to Lessor in accordance with Paragraph 50 of the Addendum within ten (10) days following receipt of an invoice.

**8.2 Liability Insurance.**

(a) **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability Policy of Insurance protecting Lessee and Lessor against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $2,000,000 per occurrence and any aggregate liability limits shall not be less than $4,000,000) with an "Additional Insured-Managers or Lessors of Premises Endorsement" and contain the "Amendment of the Pollution Exclusion Endorsement" for damage caused by heat, smoke or fumes from a hostile fire. The Policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "Insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. All insurance carried by Lessee shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

**8.3 Property Insurance - Building, Improvements and Rental Value.**

(a) **Building and Improvements.** The insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any groundlessor, and to any Lender(s) insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full replacement cost

of the Premises, as the same shall exist from tim___   ,ime, or the amount required by any Lenders, but in r___   ent more than the commercially reasonable and available insurable value thereof. If Lessor is the Insuring Party, however, Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4 rather than by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located.  If such insurance coverage has a deductible clause, the deductible amount shall not exceed ~~$50,000~~ **$1,000** per occurrence, and Lessee shall be liable for ~~Lessee's Pro Rata Share (as defined in the Addendum)~~ the deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one (1) year ~~(except that Lessee may elect to self-insure for such coverage at any time that Lessee has a tangible net worth in accordance with GAAP of at least $50,000,000).~~ Said insurance shall provide that in the event the Lease is terminated by reason of an insured loss, the period of indemnity for such coverage shall be extended beyond the date of the completion of repairs or replacement of the Premises to provide for one full year's loss of Rent from the date of any such loss.  Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next twelve (12) month period.  Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger building, or of a group of buildings owned by Lessor which are adjacent to the Premises, the Lessee shall pay for any increase in the premiums for the property insurance of such building or buildings if said increase is caused by Lessee's specific and unique use ~~acts, omissions, use or occupancy~~ of the Premises.

**8.4    Lessee's Property/Business Interruption Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed ~~$50,000~~ **$1,000** per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

**8.5** **8.6    Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least B+, V, as set forth in the most current Issue of "Best's Insurance Guide", or such other rating as may be required by a Lender.  Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee shall, prior to the Start Date, deliver to Lessor ~~certified copies of policies of such insurance or~~ certificates evidencing the existence and amounts of the required insurance.  No such policy shall be cancelable except after at least thirty (30) days prior written notice to Lessor, nor modified in any material respect or ~~subject to modification~~ except after at least fifteen (15) ~~thirty (30)~~ days prior written notice to Lessor (provided that in no event shall any such modification result in any such policy not satisfying the requirements of this Paragraph 8).  Lessee shall, at least fifteen (15) ~~thirty (30)~~ days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand.  Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.  As the option, Lessee may satisfy any or all of ~~its~~ the insurance obligations hereunder through ~~"blanket" insurance policies, so long as the "per occurrence" and "aggregate" liability limits required hereunder are applied separately to the Premises.~~

**8.6    Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein.  The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

**8.7** **8.7** **Indemnity.** Except solely to the extent of Lessor's active negligence or willful misconduct, ~~for Lessor's gross negligence or willful misconduct,~~ Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its employees, officers, agents, ~~Lessor's~~ master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, reasonable attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee (including, without limitation, Lessee's subleases, licensees, contractors, agents, visitors, invitees, employees and officers). If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.  ~~Lessee's indemnification stated above is subject to and limited by the effect of the waiver of subrogation in Paragraph 8.6 of this Lease.~~  See Addendum, Paragraph 8.7.

**8.8** **8.8** **Exemption of Lessor from Liability.** Except solely to the extent of Lessor's indemnification of Lessee set forth in Paragraph 8.7 of the Addendum, Lessor shall not be liable for injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building of which the Premises are a part, or from other sources or places.  Lessor shall not be liable for any damages arising from any act or neglect of any other tenant of Lessor. Notwithstanding Lessor's negligence or breach of this Lease, Lessor shall under no circumstances be liable for injury to Lessee's business or for any loss of income or profit therefrom.

**9.    Damage or Destruction.**

**9.1    Definitions.**

(a) **"Premises Partial Damage"** shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in nine (9) ~~six (6)~~ months or less from the date of the damage or destruction.  Lessor shall notify Lessee in writing within thirty (30) days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b) **"Premises Total Destruction"** shall mean damage or destruction to the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in ~~six (6)~~ nine (9) months or less from the date of the damage or destruction.  Lessor shall notify Lessee in writing within thirty (30) days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) **"Insured Loss"** shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) **"Replacement Cost"** shall mean the cost to repair or rebuild the Improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises.

**9.2    Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's **DV** sole cost and expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility to the extent provided in Paragraph 8.3(a)) as and when

required to complete said repairs. In the event ___ver, such shortage was due to the fact that, by rea ___ of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within ten (10) days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said ten (10) day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within ten (10) days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate thirty (30) days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made available by the either Party [notwithstanding the preceding sentence, if Premises Partial Damage occurs due to flood or earthquake, and the portion of the cost to repair such Premises Partial Damage that is not covered by insurance proceeds is less than or equal to $50,000, then (i) Lessor shall make the insurance proceeds available for such repair, and (ii) Lessee shall contribute its Pro Rata Share of the uninsured portion of such cost, and (iii) Lessor will not have the right to terminate the Lease under Paragraph 9.3].

9.3    **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or wilful act of Lessee (in which event Lessee shall make the repairs at Lessee's sole cost and expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's sole cost and expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within thirty (30) days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective sixty (60) days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within ten (10) days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within thirty (30) days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate sixty (60) days following such Destruction. If the damage or destruction was caused by the gross negligence or wilful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    **Damage Near End of Term.** If at any time during the last six (6) months of this Lease there is damage for which the cost to repair exceeds one (1) two (2) month's Base Rent, whether or not an Insured Loss, Lessor either party may terminate this Lease effective sixty (60) days following the date of occurrence of such damage by giving a written termination notice to Lessee the other party within thirty (30) days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is ten days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within ninety (90) days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than sixty (60) days following the giving of such notice. If Lessee gives such notice to Lessor and such repair or restoration is not commenced within thirty (30) days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within said thirty (30) days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7    **Termination - Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.8    **Waive Statutes.** Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.    **Real Property Taxes.**

10.1    **Definition of "Real Property Taxes."** As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein, imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises.

10.2

(a) **Payment of Taxes.** Lessor Lessee shall pay the Real Property Taxes applicable to the Premises during the term of this Lease, subject to [on] reimbursement by Lessee in accordance with Paragraph 50 of the Addendum. Subject to Paragraph 10.2(b), all such payments shall be made at least ten (10) days prior to any delinquency date. Lessee shall promptly furnish Lessor with satisfactory evidence that such taxes have been paid. If any such taxes shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such taxes shall be prorated to cover only that portion of the tax bill applicable to the period that this Lease is in effect, and Lessor shall reimburse Lessee for any overpayment. If Lessee shall fail to pay any required Real Property Taxes, Lessor shall have the right to pay the same, and Lessee shall reimburse Lessor therefor upon demand.

(b) **Advance Payment.** In the event Lessee incurs a late charge on any Rent payment, Lessor may, at Lessor's option, estimate the current Real Property Taxes, and require that such taxes be paid in advance to Lessor by Lessee, either: (i) in a lump sum amount equal to the installment due, at least twenty (20) days prior to the applicable delinquency date, or (ii) monthly in advance with the payment of the Base Rent. If Lessor elects to require payment monthly in advance, the monthly payment shall be an amount equal to the amount of the estimated installment of taxes divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable tax bill is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable taxes. If the amount collected by Lessee is insufficient to pay such Real Property Taxes when due, Lessee shall pay Lessor, upon demand, such additional sums as are necessary to pay such obligations. All monies paid to Lessor under this Paragraph may be intermingled with other monies of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any balance of funds paid to Lessor under the provisions of this Paragraph may, at the option of Lessor, be treated as an additional Security Deposit.

10.3    **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively reasonably determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.

10.4    **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause such property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said personal property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within ten (10) thirty (30) days after receipt of a written statement.

Initials _____ _____

FORM STN-8-2/97E

11.     **Utilities.** Lessee shall pay for all water, ~~gas~~, heat, light, power, telephone, trash disposal and o     utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered to Lessee, Lessee shall pay a reasonable proportion, to be reasonably determined by Lessor, of all charges jointly metered.

12.     **ON   Assignment and Subletting.**

   12.1     **Lessor's Consent Required.**

      (a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent (except for Permitted Transfers and Permitted Subleases pursuant to Paragraph 12.3(c) and 12.3(d) of the Addendum).

      (b) A change in the control of Lessee shall constitute an assignment requiring consent (except for Permitted Transfers).  The transfer, on a cumulative basis, of fifty percent (50%) ~~twenty-five percent (25%)~~ or more of the voting control of Lessee shall constitute a change in control for this purpose. This Paragraph (b) shall not apply at any time that Lessee is a publicly traded corporation.

      (c) ~~The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged-buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than twenty-five percent (25%) of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessee has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.~~

      (d) An assignment or subletting without consent (other than a Permitted Transfer or a Permitted Sublease, as defined in the Addendum) shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), ~~or a noncurable Breach without the necessity of any notice and grace period.  If Lessee fails to cure any such Default after notice per Paragraph 13.1(c), Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may elect one of the following remedies either: (i) terminate this Lease and recover the damages available to Lessor upon such termination, or (ii) without terminating this Lease, upon thirty (30) days written notice, increase the monthly Base Rent to one hundred ten percent (110%) of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment: (i) and increase the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to one hundred ten percent (110%) of the price previously in effect, and (ii) increase all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to One Hundred Ten Percent (110%) of the scheduled adjusted rent, or (iii) recover Lessor's damages resulting from such Default without~~ terminating this Lease.

      (e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

   **ON 12.2     Terms and Conditions Applicable to Assignment and Subletting.**

      (a) Regardless of Lessor's consent, any assignment or subletting shall not:  (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease; (ii) release Lessee of any obligations hereunder; or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

      (b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment.  Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

      (c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

      (d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefore to Lessor, or any security held by Lessor.

      (e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $1,000 or ten percent (10%) of the current monthly Base Rent applicable to the portion of the Premises which is the subject of the proposed assignment or sublease, whichever is greater, as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested.

      (f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment or entering into such sublease, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

   12.3     **Additional Terms and Conditions Applicable to Subletting.**  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

      (a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee.  Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

      (b) In the event of a Breach by Lessee resulting in a termination of this Lease by Lessor, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

      (c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

      (d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

      (e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.  (See Addendum, Paragraph 12.3)

13.     **Default; Breach; Remedies.**

   13.1     **Default; Breach.**  A "Default" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or rules under this Lease.  A "Breach" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace or notice and cure period:

      (a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

      (b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, ~~to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or~~ property, where such failure continues for a period of five (5) ~~three (3)~~ business days following written notice to Lessee.

      (c) The failure by Lessee to provide (i) ~~reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii)~~ (i) the rescission of an unauthorized assignment or subletting within ten (10) business days following written notice to Lessee, ~~(iii)~~ (ii) a requested Estoppel Certificate within the time period required in Paragraph 16, or ~~(iv)~~ (iii) a requested Non-Disturbance Agreement within the time period required in Paragraph 30.4, or (iv) reasonable evidence of insurance coverage required under this Lease within ten (10) business days following written notice to Lessee, ~~subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42 (easements), or (viii) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of ten (10) business days following written notice to Lessee.~~

      (d) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b) or (c), above, where such Default continues for a period of thirty (30) days after written notice; provided, however, that if the nature of Lessee's Default is such that more than thirty (30) days are reasonably required for its cure, then it shall not be deemed to be a Breach

if Lessee commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

(e) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within sixty (60) days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within thirty (30) days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within thirty (30) days; provided, however, in the event that any provision of this subparagraph 13.1 (e) is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(f) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(g) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor; (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty; (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing; (iv) a Guarantor's refusal to honor the guaranty; or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within sixty (60) days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2   **Remedies.**  If Lessee fails to perform any of its affirmative duties or obligations, within ten (10) business days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals.  The reasonable out-of-pocket costs and expenses of any such performance by Lessor shall be due and payable by Lessee within ten (10) business days following upon receipt of invoice therefor.  If any check given to Lessor by Lessee shall not be honored by the bank upon which it is drawn, Lessor, at its option, may require all future payments to be made by Lessee to be by cashier's check.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent (1%).  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1.  In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations.  Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located.  The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3   **Inducement Recapture.**  Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "Inducement Provisions," shall (to the extent provided below) be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease.  Upon a termination of this Lease based upon a Breach of this Lease by Lessee, any such Inducement Provision (to the extent provided below) shall automatically be deemed deleted from this Lease and of no further force or effect, and the unamortized portion (on a straight-line basis over the Lease Term excluding any unexercised Options to extend such Term) of any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor (such amount may be recovered by Lessor as damages from Lessee).  In addition to any other damages recoverable by Lessor under this Lease or applicable law) , notwithstanding any subsequent cure of said Breach by Lessee.  The acceptance by Lessor of Rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4   **Late Charges.**  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender.  Accordingly, if any Rent shall not be received by Lessor within five (5) ten (10) business days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a one-time late charge equal to ten percent (10%) five percent (5%) of each such overdue amount.  The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder.  In the event that a late charge is payable hereunder, whether or not collected, for three (3) consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.  See Addendum, Paragraph 13.4.

13.5   **Interest.**  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, within five (5) calendar days of when due as to scheduled payments (such as Base Rent) or within thirty (30) days following the date on which it was due for non-scheduled payment, shall bear interest from the date when due, as to scheduled payments, or the thirty-first (31st) day after it was due as to non-scheduled payments.  The interest ("Interest") charged shall be equal to the prime rate reported in the Wall Street Journal as published closest prior to the date when due plus four percent (4%), six percent (6%), compounded monthly, but shall not exceed the maximum rate allowed by law.  Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6   **Breach by Lessor.**

(a) Notice of Breach.  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor.  For purposes of this Paragraph, a reasonable time shall in no event be less than thirty (30) days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than thirty (30) days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such thirty (30) day period and thereafter diligently pursued to completion.

(b) Performance by Lessee on Behalf of Lessor.  In the event that neither Lessor nor Lender cures said breach within thirty (30) days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect (but shall not be obligated) to cure said breach at Lessee's expense and offset from Rent an amount equal to Lessee's reasonable out-of-pocket costs incurred by Lessee to cure such breach, up to (but not exceeding) the greater of one month's Base Rent or the Security Deposit, and to pay any an excess of such expense under protest; reserving Lessee's right to reimbursement from Lessor.  Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.   **Condemnation.**  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs.  If more than ten percent (10%) of any building portion of the Premises, or more than fifteen percent (15%) twenty-five percent (25%) of the land area portion of the Premises not occupied by any building, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within ten (10) days after

Lessor shall have given Lessee written notice of such holding (or in the absence of such notice, within ten (10) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15.** **Brokers' Fee.**

15.1 **Additional Commission.** In addition to the payments owed pursuant to Paragraph 1.10 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any its Option to Expand into the remaining portion of the building in accordance with Addendum, Paragraph 53 on or before February 1, 2005, (b) if Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay the Brokers that are the procuring Brokers a fee in accordance with the listing agreement schedule with Collins Commercial Corporation of said Brokers in effect at the time of the execution of this Lease. The additional commission shall be payable to the procuring Brokers, 50% upon full execution of the applicable lease amendment and 50% upon the commencement of rental payments and/or occupancy of the Expansion Premises by Lessee. Lessor recognizes Mr. Rick Gill of Collins Commercial Corporation as the procuring Broker in this transaction. Lessor and Brokers acknowledge and agree that Lessee shall have no obligation to pay any commission, fee or other amount to Brokers.

15.2 **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Each Broker shall be a third party beneficiary of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to a Broker any amounts due as and for commissions pertaining to this Lease when due, then such amounts shall accrue interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within ten (10) days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker.

15.3 **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, and/or attorneys' fees reasonably incurred with respect thereto.

**16.** **Estoppel Certificates.**

(a) Each Party (as "**Responding Party**") shall within ten (10) business days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the American Industrial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such ten day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Responding Party, not more than one month's Rent has been paid in advance. Prospective purchasers and encumbrancers and assignees may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including, but not limited to, Lessee's financial statements for the past three (3) years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17.** **Definition of Lessor.** The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Except as provided in Paragraph 15, upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor (and the transferee shall be deemed to have assumed all such obligations of the Lessor thereafter accruing, whether or not a formal assumption is made). Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined. Notwithstanding the above, and subject to the provisions of Paragraph 20 below, the original Lessor under this Lease, and all subsequent holders of the Lessor's interest in this Lease shall remain liable and responsible with regard to the potential duties and liabilities of Lessor pertaining to Hazardous Substances as outlined in Paragraph 6 above.

**18.** **Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19.** **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

**20.** **Limitation on Liability.** Subject to the provisions of Paragraph 17 above, the obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, the individual partners of Lessor or its or their individual partners, directors, officers or shareholders, and Lessee shall look to the Project Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against the individual partners of Lessor, or its or their individual partners, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21.** **Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22.** **No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party. The liability (including court costs and Attorneys' fees), of any Broker with respect to negotiation, execution, delivery or performance by either Lessor or Lessee under this Lease or any amendment or modification hereto shall be limited to an amount up to the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

**23.** **Notices.**

23.1 **Notice Requirements.** All notices required or permitted by this Lease shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered U.S. mail, or U.S. Postal Service Express Mail, Federal Express or other commercial messenger service, in each case with postage prepaid and receipt of delivery requested, or by facsimile transmission, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Each Party's address for delivery or mailing of notices shall be (i) for Lessor, the address stated after Lessor's signature at the end of this Lease, and (ii) for Lessee, the address stated in Paragraph 23.1 of the Addendum. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing. See Addendum, Paragraph 23.1.

23.2 **Date of Notice.** Any notice sent by registered or U.S. certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given forty-eight (48) hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail, Federal Express or other commercial messenger service overnight courier that guarantees next-day delivery shall be deemed given upon the date of delivery or attempted delivery to the address of the receiving party (as evidenced by the receipt of date of delivery or attempted delivery provided by such delivery service) twenty-four (24) hours after delivery of the same to the Postal Service

or courier. Notices transmitted by facsimile transm        n or similar means shall be deemed delivered upon tele     e confirmation of receipt, provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.     **Waivers.** No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessee's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

25.     **Recording.** Either Lessor or Lessee shall, upon request of the other, execute, acknowledge and deliver to the other a short form memorandum of this Lease for recording purposes, which memorandum may be in the form of Exhibit "C" attached to this Lease. The Party requesting recordation shall be responsible for payment of any fees applicable thereto. Upon the expiration or earlier termination of this Lease, Lessee shall be responsible, within ten (10) business days after request by Lessor, to execute and deliver to Lessor in recordable form a quitclaim deed relinquishing all of Lessee's right, title and interest in or to the Project and the Adjacent Vacant Parcel, or to deliver any other documents reasonably requested by Lessor to expunge this Lease and the recorded memorandum thereof from Lessor's title to the property.

26.     **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to one hundred fifty percent (150%) of the Base Rent applicable during the month immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.     **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.     **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.     **Binding Effect; Choice of Law.** This Lease shall be binding upon, and shall inure to the benefit of, the parties, their personal representatives, successors and assigns (subject to any restrictions on assignment, sublease or other transfers of Lessee's interest contained in this Lease) and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.     **Subordination; Attornment; Non-Disturbance.**

30.1     **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now existing, or, subject to Paragraph 30.3 below, hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lessor's Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease (except during any period of ownership of the Premises, and further subject to any restrictions provided herein or in any Non-Disturbance Agreement, as defined below). Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2     **Attornment.** Subject to the non-disturbance provisions of Paragraph 30.3, Lessee agrees to attorn to a Lender or any other party who acquires ownership of the Premises by reason of a foreclosure of a Security Device, and that in the event of such foreclosure, such new owner shall not: (i) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (ii) be subject to any offsets or defenses which Lessee might have against any prior lessor; or (iii) be bound by prepayment of more than one (1) month's rent.

30.3     **Non-Disturbance.** With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease (including any Options) shall be subject to receiving a commercially reasonable subordination, non-disturbance and attornment agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any Options options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises, and other provisions as more fully described in Paragraph 30.3 of the Addendum. Further, within sixty (60) days after the execution of this Lease, Lessor shall use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement with said sixty (60) days, then Lessee may, at Lessee's option, directly contact Lessor's lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement. See Addendum, Paragraph 30.3.

30.4     **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein within ten (10) business days following delivery thereof to Lessee.

31.     **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises to enforce the terms hereof or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach.

32.     **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times with one (1) business day advance notice to Lessee for the purpose of showing the same to prospective purchasers, lenders, or lessees (as to prospective lessees, during the last six (6) months of the term only), and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary, subject to Paragraph 6.4 of the Addendum, and provided that Lessor shall conduct such activities in such a manner as to minimize any interference to Lessee's operations in the Premises). All such activities shall be without abatement of rent or liability to Lessee. Lessor may at any time place on the Premises any ordinary "For Sale" signs and Lessor may during the last six (6) months of the term hereof place on the Premises any ordinary "For Lease" signs. Lessee may at any time place on or about the Premises any ordinary "For Sublease" sign. See Addendum, Paragraph 32.

33.     **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.     **Signs.** Except for ordinary "For Sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.     **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within ten (10) days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.     **Consents.** Except as otherwise provided herein, wherever in this Lease the consent or approval (each, a "consent") of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed or conditioned. Lessor's actual reasonable costs and expenses (including, but not limited to, architects', attorneys', engineers' and other consultants' fees) reasonably incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including, but not limited to, consents to an assignment, a subletting or the presence or use of a Hazardous Substance (and except that the fee for consents to assignments and subleases is the fixed amount specified in Paragraph 12.2(e) above), shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further

or other conditions as are then reasonable with refe      e to the particular matter for which consent is being gi    In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the det...ining party shall furnish its reasons in writing and in reasonable detail within ten (10) business days following such request.

**37.      Guarantor.**

37.1      Execution. The Guarantors, if any, shall each execute a guaranty in the form most recently published by the American Industrial Real Estate Association, and each such Guarantor shall have the same obligations as Lessee under this Lease.

37.2      Default. It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) a Tenancy Statement, or (d) written confirmation that the guaranty is still in effect.

**38.      Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

**39.      Options.**

39.1      Definition. "Option" shall mean: (a) the right to extend the term of or renew this Lease ~~or to extend or renew any lease that Lessee has on other property of Lessor~~; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2      Options Personal To Original Lessee. Each Option granted to Lessee in this Lease is personal to and *may be exercised by the original Lessee and any Permitted Transferee (as defined in Paragraph 12.3(c) of the Addendum),* and cannot be assigned or exercised by anyone other than said original Lessee *(or Permitted Transferee)* and only while the original Lessee *(or Permitted Transferee)* is in full possession of the Premises *(except that Lessee may sublease up to five percent (5%) of the Premises and still be deemed in full possession for purposes of this Paragraph)* and, if requested by Lessor, with Lessee certifying that Lessee has no present intention of thereafter assigning or subletting *(other than a Permitted Transfer or a Permitted Sublease)*.

39.3      Multiple Options. In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4      Effect of Default on Options.

(a) ~~Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time after a Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given three (3) or more notices of separate Default, whether or not the Defaults are cured, during the twelve (12) month period immediately preceding the exercise of the Option.~~ See Addendum, Paragraph 39.4(a).

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) ~~An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term, (i) Lessee fails to pay Rent for a period of thirty (30) days after such Rent becomes due (without any necessity of Lessor to give notice thereof), (ii) Lessor gives to Lessee three (3) or more notices of separate Default during any twelve (12) month period, whether or not the Defaults are cured, or (iii) if Lessee commits a Breach of this Lease.~~ See Addendum, Paragraph 39.4(c).

**40.      Multiple Buildings.** ~~If the Premises are a part of a group of buildings controlled by Lessor, Lessee agrees that it will observe all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and that Lessee will pay its fair share of common expenses incurred in connection therewith.~~

**41.      Security Measures.** Lessee hereby acknowledges that the rental payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

**42.      Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor *reasonably* deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee *and do not unreasonably diminish any of Lessee's rights under this Lease or impose any costs or obligations on Lessee.* Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

**43.      Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.

**44.      Authority.** If either Party hereto is a corporation, trust, limited liability company,  partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within thirty (30) days after request, deliver to the other Party satisfactory evidence of such authority.

**45.      Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**46.      Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**47.      Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. ~~As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.~~

**48.   .     Multiple Parties.** If more than one person or entity is named herein as either Lessor or Lessee, such multiple Parties shall have joint and several responsibility to comply with the terms of this Lease.

**49.      Mediation and Arbitration of Disputes.** An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☒ is not  attached to this Lease.

THIS LEASE CONTAINS ADDITIONAL PARAGRAPHS THAT ARE SET FORTH IN AN ADDENDUM ATTACHED HERETO AND REFERENCED IN PARAGRAPH 1.12 ABOVE.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT



RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING: IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

*SIGNATURES APPEAR ~~ON NEXT PAGE~~ BELOW*

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: Irvine, CA | Executed at: Corona, CA |
| on: as of February 1, 2003 | on: as of February 1, 2003 |
| By LESSOR: | By LESSEE: |
| Corona Dolphin, LP, a California limited partnership | Smiths Aerospace, Inc., a Delaware corporation |
| By: Yellowfin Equities, LP, a California limited partnership, Its General Partner | By: _____ |
| By: Dolphin Partners, Inc., a California corporation, Its General Partner | Robert E. Ehr, President, Electronic Systems |
| By: _____ | By: _____ |
| Kevin S. Pitts, President | Ronald C. Albrecht, Vice President, U.S. Operations, Electronic Systems |
| [Printed Name and Title] | |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: _____ |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: _____ |
| Address: 17875 Von Karman, Suite 300, Irvine, CA 92614 | Address: [See Addendum, Paragraph 23.1) |
| Telephone: (949) 852-9230 | Telephone: ( ) _____ |
| Facsimile: (949) 852-8924 | Facsimile: ( ) _____ |
| Federal ID No. _____ | Federal ID No. _____ |

NOTE: These forms are often modified to meet the changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION, 700 So. Flower Street, Suite 600, Los Angeles, California 90017. (213) 687-8777. Fax No. (213) 687-8616



©1997 - American Industrial Real Estate Association

FORM STN-6-2/97E

# ADDENDUM TO STANDARD INDUSTRIAL/COMMERCIAL

# SINGLE TENANT LEASE

This Addendum (this "**Addendum**") is attached to and made a part of that certain Standard Industrial/Commercial Single Tenant Lease — Net (the "**Lease**") dated as of February 1, 2003, by and between Corona Dolphin, LP, a California limited partnership ("**Lessor**") and Smiths Aerospace, Inc., a Delaware corporation (**Lessee**"). Paragraph references below correspond to the same paragraph references in the Lease, or are new paragraphs added to the Lease. The provisions in this Addendum shall govern in the event of any conflict with the Lease provisions. All capitalized terms used in this Addendum, unless specifically defined in this Addendum, shall have the same meanings given thereto in the Lease.

1.2     As used in the Lease (i) the "**Project**" means the parcel of approximately 10.7 acres with paving and landscaping, together with the Building (as defined below) and other improvements situated thereon, as shown on the site plan attached as Exhibit "A" to the Lease and as described in the legal description attached as Exhibit "B" to the Lease (other than the Adjacent Vacant Parcel, as defined below, which is included in such legal description but is not a part of the Project), (ii) the "**Building**" means the industrial/commercial building situated within the Project containing approximately 208,993 square feet of space, and (iii) the "**Premises**" means, collectively, (A) the portion of the Building that is being leased by Lessee containing approximately 127,480 square feet of space, as shown by cross-hatching on Exhibit "A", (B) the entire existing access road to the west of Monica Circle up to the point where such access road connects with Monica Circle ("**Lessee's Access Road**"), and (C) the exterior parking and landscape areas designated as Lessee's "Lessee's Outside Exclusive Use Area" on Exhibit "A" (such exterior parking and landscape areas, together with the entire Lessee's Access Road including any portion thereof which may be outside of the boundaries of the Lessee's Outside Exclusive Use Area as shown on Exhibit "A", are collectively referred to herein as "**Lessee's Outside Exclusive Use Area**"). The Project does not include that certain vacant parcel of approximately 3.72 acres that is adjacent to the Project (the "**Adjacent Vacant Parcel**"). The parties agree that the square footage numbers stated above for the Building and the Premises are agreed-upon numbers that are not subject to further re-measurement.

1.3     **Commencement Date**. The "Commencement Date" of February 1, 2003 is a fixed date which is not subject to adjustment. Rent shall commence on the Commencement Date (retroactively, if the Lease is signed after the Commencement Date). Lessee shall receive possession of the Premises on the Commencement Date. Lessor's completion of the Lessor's TI Work (as defined below) is not a condition to the Commencement Date.

1.4     **Joint Construction of Lessor's TI Work and Lessee's TI Work**. The parties acknowledge that Lessee has requested that Lessor schedule different components of Lessor's TI Work in a manner that will reasonably facilitate Lessee's planning and construction of Lessee's TI Work (as defined below). Either before or promptly after execution of this Lease, Lessor and Lessee shall mutually prepare a written schedule (the "**Work Schedule**") for the completion of Lessor's TI Work and Lessee's TI Work. The Work Schedule shall, among other things, specify the order in which each parties' work will be made and the estimated duration thereof. The Work Schedule may be modified from time to time to accommodate construction timing and coordination issues. Lessor shall use commercially reasonable efforts to (i) cooperate with Lessee in preparing and revising the Work Schedule as needed, and (ii) commence and complete the various components of the Lessor's TI Work in accordance with the Work Schedule, so that both the Lessor's TI Work and the Lessee's TI Work will be completed as soon as possible following the Commencement Date.

1.5.    **Base Rental Increases**:  The monthly Base Rent payable under Paragraph 1.5 of the Lease shall be automatically increased in accordance with the following schedule:

| | |
|---|---|
| February, 2003: | $ 68,471.80 |
| March 1, 2003 – May 31, 2003: | $       0.00 per month |
| June 1, 2003 – July 31, 2005: | $ 68,471.80 per month |
| August 1, 2005 – January 31, 2008: | $ 72,751.29 per month |
| February 1, 2008 – July 31, 2010: | $ 77,298.24 per month |



*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

August 1, 2010 – January 31, 2013:      $ 82,129.38 per month

1.7    <u>Security Deposit</u>.  So long as the Lessee hereunder is Smiths Aerospace, Inc., or any
Permitted Transferee that is a successor by merger, consolidation or other business combination
involving not less than 51% ownership by Smiths Aerospace, Inc., there shall be no security
deposit of any nature required, notwithstanding anything in this Lease to the contrary.

6.1    <u>Use</u>:    Lessee agrees that its use of the Premises shall not suffer or permit the obstruction
of any common areas of the Project, including driveways, walkways and stairways (but
excluding any common areas within the Lessee's Outside Exclusive Use Area).  Further, Lessee
shall not make or permit any excessive noise or odors that unreasonably disturb, interfere with or
create a nuisance for other lessees in the Project (except that the Parties acknowledge that the
foregoing restriction is made with the intention that Lessor will lease the Remaining Space for
uses that are typical for industrial buildings, such as manufacturing, warehouse, distribution or
similar uses, as contrasted with non-typical uses such as professional offices or a church).

                In addition to any other requirements of this Lease, Lessee's possession and
tenancy under this Lease shall be in conformance with the provisions of that certain Amended
and Restated Declaration of Covenants, Conditions, Restrictions and Easements recorded June
10, 1987, as Instrument No. 164009, in the Official Records of the County Recorders Office of
Riverside County, as amended, and Lessee, its agents, employees and business invitees shall
comply with all the provisions thereof.

6.2(a) <u>Reportable Uses Require Consent</u>:  Notwithstanding anything in Paragraph 6.2 or any
other provision of the Lease to the contrary, Lessee may not, without Lessor's prior written
consent (which Lessor may withhold in its sole, absolute and arbitrary discretion) install any
underground storage tank, even if underground storage tanks are customary and reasonable in
Lessee's business operations.  Further, the inclusion of a Hazardous Substance within the
coverage of California Proposition 65 will not, in and of itself, make the use of such Hazardous
Substance a Reportable Use, unless the use of such Hazardous Substance entails a meaningful
risk of environmental contamination to the Premises.

6.2(c) <u>Lessee Remediation</u>:  Lessee acknowledges that Lessee shall have exclusive control
over the Premises during the Lease Term (subject to the various provisions of this Lease
allowing Lessor, its contractors and agents, access to the Premises), and therefore Lessee is
responsible under Paragraph 6.2(c) for remediation of, and under Paragraph 6.2(d) for
indemnification for claims involving, Hazardous Substances released on the Premises during the
Lease Term by or for Lessee or any third party, except to the extent such releases result from (i)
underground migration from neighboring properties, (ii) the activities of neighboring tenants or
land owners, or (iii) the activities of Lessor or its employees, contractors or agents.

6.2(h) <u>Environmental Assessments at Beginning and End of Term</u>:  Lessee shall obtain at its
sole cost a phase 1 environmental assessment of the Premises prior to or as soon as reasonably
possible following the Commencement Date in order to assist in determining the existing
environmental status of the Premises.  Lessee shall further obtain at its sole cost a phase 1
environmental assessment of the Premises upon the expiration or earlier termination of this
Lease (or upon an assignment of Lessee's interest under this Lease other than a Permitted
Transfer), in order to assist in identifying any contamination that may have occurred during
Lessee's occupancy of the Premises.  Lessee shall not be required to obtain supplemental tests or
assessments beyond the phase 1 report itself (**"Phase 2 Work"**), unless such Phase 2 Work is
required by Applicable Requirements or by governmental or quasi-governmental authorities
having jurisdiction and is related to environmental contamination for which Lessee is responsible
under this Lease (in which case Lessee shall be required to obtain at its sole cost any such
required Phase 2 Work).  Nothing herein shall preclude Lessor from obtaining, at its own cost,
any Phase 2 Work recommended in any phase 1 assessment or otherwise (and if any such Phase
2 Work reveals environmental contamination for which Lessee is responsible under this Lease,
Lessee shall reimburse Lessor for the reasonable cost of such Phase 2 Work).  Lessee shall
provide Lessor with copies of any environmental tests or assessments obtained by Lessee with
respect to the Premises.



*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

6.2(i)  **Reporting Requirements With Respect to Hazardous Substances Used in Lessee's Operations**.  Lessee shall provide to Lessor at Lessee's expense (in addition to any other requirements of the Lease), the following disclosures or reports (in such detail as may reasonably be required by Lessor or its consultants): (i) prior to commencing operations in the Premises, a disclosure of Hazardous Substances and Reportable Uses that are anticipated in connection with Lessee's operations at the Premises, and a description of the steps that will be taken to comply with Applicable Laws (including obtaining permits and implementing containment measures and disposal procedures); (ii) during the Term, whenever there occurs any significant change in the quantities of Hazardous Substances actually used in Lessee's operation at the Premises from that previously disclosed to Lessor, or whenever Lessee's operations at the Premises involve any new Hazardous Substances or Reportable Uses not previously disclosed to Lessor, Lessee shall provide Lessor with an updated disclosure or report (containing the same information that is described in clause (i) above) with respect to such changed quantities and new items; and (iii) if requested by Lessor, copies of any reasonable back-up information evidencing Lessee's compliance with Applicable Laws or any other items disclosed in such reports.

6.4     **Inspection; Compliance**:  Lessor's entry shall be subject to Lessee's security screening policies, including such policies that may be imposed as a result of Lessee's government contracts (unless compliance with such policies is not practical in the event of an emergency).

6.5     **Representations and Warranties of Lessor**:  Lessor represents and warrants to Lessee, as of the date of this Lease, the following (provided that all representations or warranties set forth below or elsewhere in this Lease that are limited to Lessor's knowledge shall be limited to the actual, current knowledge of John Kingsley and Kevin Pitts as of the date hereof, without any duty to investigate):

(i)  **Title**.  To Lessor's actual knowledge, Lessor has good and marketable fee simple title to the Premises.

(ii)  **Condemnation**.  Lessor has no actual knowledge of any pending or threatened condemnation action with respect to the Premises or Project.

(iii)  **Legal Proceedings**.  Lessor has no actual knowledge of any pending or threatened legal actions or proceedings that could materially adversely affect Lessee's rights under this Lease with respect to the Premises or the Project.

(iv)  **Utilities**.  Connections for water, sanitary sewer, storm sewer, natural gas, electricity and telephone service are currently available at the Premises.  Lessee is responsible for determining the adequacy of such existing utilities for Lessee's needs.

(v)  **Access**.  The Premises have access to a public street.

7.1(b)  **Service Contracts**:  Lessee shall be required to obtain only service contracts for equipment and improvements that exclusively serve the Premises.  Service contracts (to the extent required by the Lease or reasonably deemed necessary by Lessor) for any equipment and improvements that serve the Premises and the Remaining Space shall be obtained by Lessor, and Lessee shall pay to Lessor its Pro Rata Share of the entire cost thereof in accordance with Paragraph 50 below.

7.1(c)  **Replacement**:  Lessee shall be required to replace only equipment and improvements, including Basic Elements, that exclusively serve the Premises.  Lessor shall replace any equipment and improvements that serve the Premises and the Remaining Space, and Lessee shall pay to Lessor its Pro Rata Share of the entire cost thereof (without amortization) in accordance with Paragraph 50 below (except that the cost of roof replacement shall be subject to the special allocation set forth in Paragraph 50(e)).

7.4(b)  **Removal**:  In no event, however, will Lessee be obligated to remove any cabling (whether installed by Lessee or any pre-existing cabling) located above the ceiling grid or inside of walls.



W97-OC:NAS\41298875.9                          -3-

*rcw*

*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

8.7     **Indemnity**: Except to the extent of Lessee's negligence or willful misconduct, and except as further limited hereinbelow, Lessor shall indemnify, protect, defend and hold harmless Lessee and its employees, agents, officers and directors from and against any and all claims, losses, damages, liens, judgments, penalties, reasonable attorneys' and consultants' fees, expenses and/or liabilities to the extent caused by the active negligence or willful misconduct of Lessor or its employees, agents or contractors in or about the Premises. If any action or proceeding is brought against Lessee by reason of any of the foregoing matters, Lessor shall upon notice defend the same at Lessor's expense by counsel reasonably satisfactory to Lessee and Lessee shall cooperate with Lessor in such defense. Lessee need not have first paid any such claim in order to be defended or indemnified. Lessor's indemnification stated above, however, is subject to and limited by the following: (i) the effect of the waiver of subrogation in Paragraph 8.6 of the Lease; (ii) Lessor shall have no liability whatsoever with respect to any loss or damage with respect to any equipment, machinery, inventory, furniture or any other property on or about the Premises (Lessee having assumed the obligation to insure or self-insure against any such loss of property); and (iii) Lessor shall under no circumstances be liable for injury to Lessee's business or for any loss of income or profit therefrom (it being Lessee's obligation to insure against any such loss).

12.3     **Additional Terms and Conditions Applicable to Assignment and Subletting**: The following additional terms are applicable to any assignment or sublease:

        (a)     As an alternative to approving or disapproving any request for consent to an assignment or sublease, Lessor may (in its sole discretion), elect by written notice to Lessee to terminate the Lease either (i) as to the entire Lease in the event of a proposed assignment (other than a Permitted Transfer), or (ii) as to the portion of the Lease intended to be subleased in the event of a proposed sublease (other than a Permitted Transfer or a Permitted Sublease).

        Lessor may exercise such termination option by delivering written notice to Lessee ("**Lessor's Termination Notice**") within fifteen (15) business days after receiving Lessee's written request for consent to the proposed assignment or sublease ("**Lessee's Request**"). If Lessor fails to deliver Lessor's Termination Notice within such fifteen (15) business day period, Lessor shall be deemed to have elected to not terminate the Lease. If Lessor delivers Lessor's Termination Notice within such fifteen (15) business day period, the Lease Term (either as to the entire Premises or portion thereof, as applicable), shall be deemed expired (and all unexercised Options terminated) as of the proposed effective date for the proposed assignment or sublease set forth in the Lessee's Request (the "**Termination Date**"). Thereafter, Lessor may lease the Premises (or portion thereof, as applicable) that is no longer subject to this Lease, to any person or entity (including the proposed assignee or sublessee) without liability to Lessee. If the Lease is so terminated as to a portion of the Premises, monthly Base Rent and Lessee's Pro Rata Share (defined below) shall be adjusted as of the Termination Date based on the ratio of the rentable square feet of the original Premises to the rentable square feet of the remaining Premises. Notwithstanding the foregoing, if Lessor timely delivers Lessor's Termination Notice, Lessee shall have the right to rescind Lessee's Request by delivering written notice of rescission to Lessor within ten (10) days after receiving Lessor's Termination Notice, in which event Lessor shall not have the right to terminate the Lease pursuant to this Paragraph.

        (b)     In the event Lessee assigns the Lease or subleases the Premises or portion thereof (other than a Permitted Transfer), Lessee will pay to Lessor within thirty (30) days after Lessee's receipt thereof, fifty percent (50%) of all Excess Rent (as defined below) received by Lessee from such assignment or sublease. As used herein, "**Excess Rent**" means all rent (and all other consideration, however designated, that is reasonably attributable to the value of the Lease or Premises) received by Lessee as a result of such assignment or sublease that is in excess of rent payable under this Lease (on a per square foot basis, if less than the entire Premises is involved), after deducting therefrom all out-of-pocket costs actually incurred by Lessee in connection with the assignment or subleasing, including, attorneys fees, broker commissions, finders fees, tenant improvement costs and any other concessions or inducements.

        (c)     Notwithstanding anything to the contrary contained in this Paragraph 12, Lessee shall have the right to assign the Lease or sublease all or a portion of the Premises, without the prior consent of Lessor, to an affiliate, any entity controlled by Lessee's parent company, any

 

*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

person or entity acquiring, in one or a series of transactions, more than fifty percent (50%) of the stock of Lessee or Lessee's parent, or any person acquiring all or substantially all of the assets or business of the Electronics Systems division of Lessee or to the entity resulting from a merger, consolidation or other business combination with or involving Lessee, provided, however, that such transferee has a tangible net worth (determined in accordance with generally accepted accounting principles consistently applied) following such transfer of at least $50,000,000.00 (each of the foregoing shall be referred to as a "**Permitted Transfer**", and any party to a Permitted Transfer shall be referred to as a "**Permitted Transferee**").  Lessee shall notify Lessor in writing of any Permitted Transfer at least ten (10) business days after the occurrence thereof, and shall concurrently provide Lessor with (i) evidence of compliance with the net worth requirement stated above, (ii) if a sublease is involved, a copy of the fully executed sublease (which sublease shall comply with all requirements of California law applicable to subleases), and (iii) if an assignment is involved, a copy of a fully executed assignment and assumption agreement which contains an unconditional assignment of Lessee's rights under the Lease from the transferror to the transferee, and an unconditional assumption of Lessee's obligations under the Lease by the transferror, and which otherwise is sufficient under California law to effect a valid assignment of the Lessee's interest in and to the Lease.  Lessee shall also provide Lessor, within ten (10) business days following request by Lessor, any additional back-up documentation that Lessor may reasonable require to enable Lessor to determine compliance with the above net worth requirement and to understand the nature of the transaction and any change in the Lessee or its ownership structure or the use of the Premises.  Any Permitted Transfer shall be subject to all of the terms and conditions applicable to assignments and subleases under this Lease (other than the requirement for Lessor's consent and the payment of Excess Rent as provided above), including that the transferor shall remain fully liable under this Lease following the Permitted Transfer.  At Lessor's option, the transferor shall execute a guaranty of this Lease in a form reasonably required by Lessor (although such a guaranty shall not be necessary for the continuing liability of the transferor entity).

      (d)    Notwithstanding anything to the contrary contained in this Paragraph 12, Lessee shall have the right to sublease up to five percent (5%) of the Premises, without the prior consent of Lessor, to any third party (a "**Permitted Sublease**").

13.4   **Late Charges**:  Lessor will waive the late charge for any rent owing during the months from February through May, 2003, so long as the applicable rent payment is received by at least the twentieth (20th) day of the month in which it is due (since no Base Rent is owing for the months of March, April and May, the foregoing waiver will apply only to payments of additional rent owing under Paragraph 50 during such period).

23.1   **Notice Requirements**:  Lessee's address for notice purposes is set forth below:

| | |
|---|---|
| Lessee: | Smiths Aerospace, Inc.<br>550 Monica Circle<br>Corona, CA 92880<br>Attention:  Steve Breunle<br>Telephone:  (to be provided)<br>Fax:  (to be provided) |
| With a copy to: | Smiths Aerospace, Inc.<br>3290 Patterson Ave., South East<br>Grand Rapids, MI 49512<br>Attention:  Ron Albrecht<br>Telephone:  616-241-8248<br>Fax:  616-241-7423 |
| And with a copy to: | Morgan, Lewis & Bockius, LLP<br>300 S. Grand Avenue, Suite 2200<br>Los Angeles, California 90071<br>Attention: Mary L. Dickson, Esq.<br>Telephone: (213)612-2580<br>Fax: (213)612-2554 |

 

*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

30.3 **Non-Disturbance**: Lessor has not placed any currently effective Security Device upon the Premises, and to Lessor's actual knowledge there are no currently effective Security Devices affecting the Premises. With respect to any future Security Devices, the following provisions (or reasonable variations thereof required by a particular Lessor's Lender), shall be deemed appropriate for a commercially reasonable Non-Disturbance Agreement: (i) the liability limitations following foreclosure or deed in lieu of foreclosure set forth in Paragraph 30.2 of the Lease; (ii) a right of such Lender to receive notice of Lessor's default under the Lease, and a right to cure the same within thirty (30) days of receipt of such notice (or such reasonable additional period of time as may be necessary to acquire possession of the Premises and to effect the cure); (iii) a right to approve any amendments to the Lease; (iv) a provision limiting any Lender's liability under the Lease to the time during which such Lender owns fee title to the Premises; (v) other reasonable lender protections; and (vi) a provision that Lessee's Options shall not be impaired or terminated as a result of the foreclosure or termination of the Security Device. The parties acknowledge that other reasonable lender protections may also be required in a commercially reasonable Non-Disturbance Agreement.

32 **Lessor's Access; Showing Premises; Repairs**: Lessor's entry shall be subject to Lessee's security screening policies, including such policies that may be imposed as a result of Lessee's government contracts (unless compliance with such policies is not practical in the event of an emergency).

39.4 **Effect of Default on Options**:

(a) Lessee shall have no right to exercise any Option during any time that a Material Default (as defined below) exists. A "**Material Default**" shall mean (i) any Breach by Lessee in any monetary obligation under this Lease, or (ii) any Breach by Lessee in any material respect in any other non-monetary term, covenant or condition of the Lease.

(b) See Lease – unchanged.

(c) At Lessor's sole option, any exercise of an Option by Lessee shall automatically be terminated and rendered of no force or effect if a Material Default arises at any time during the period from Lessee's exercise of such Option until such Option is consummated (i.e., the consummation of an option to extend the term shall mean the commencement of the option term; the consummation of a right of first refusal to lease shall mean Lessee's taking possession of such additional space; and the consummation of a right of first refusal to purchase shall mean the close of escrow for the sale of the applicable real property).

50. **Multi-Tenant Project Provisions**: Lessor and Lessee acknowledge that the Lease form is for a single tenant net lease, even though Lessee is not occupying the entire Building nor the entire Project. The parties have intentionally made this choice since Lessee will occupy the majority of the Project on a long-term basis, and the Premises will be more highly upgraded than the balance of the Project and for most purposes will be completely segregated from the balance of the Project. Therefore, the parties intend that Lessee shall have the obligations of a single tenant lessee as set forth in the Lease with respect to all portions of the Premises and any systems or facilities that exclusively service the Premises, subject to the following exceptions and agreements:

(a) Lessee will have the exclusive use of, and exclusive responsibility for the maintenance and upkeep of under Paragraph 7.1 and other applicable provisions of the Lease, Lessee's Outside Exclusive Use Area. Lessee will not have any right to access or use any other outside areas of the Project that are not included within Lessee's Outside Exclusive Use Area. In accordance with the Work Schedule, Lessor shall install (at Lessor's expense) a standard 8 foot chain link fence that will separate the rear loading area portion of Lessee's Outside Exclusive Use Area from the other outside areas of the Project (the location of the fence is shown in the site plan attached as Exhibit "A" hereto). Lessee's sole access to the Project shall be Lessee's Access Road, and the access road to the east of Monica Circle shall be for the exclusive use of the future user(s) of the remaining vacant space within the Building.



*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

(b)    Lessor shall pay (i) the Real Property Taxes for the Project, and (ii) any common area utility costs (such as, but not limited to, electricity and water) that are not segregated or separately metered among the tenants of the Project and that do not exclusively benefit any of the other tenants of the Project or their respective premises; and Lessee shall reimburse Lessor for Lessee's Pro Rata Share (as defined below) of the cost of these items.  In addition, if Lessee's alterations to the Premises cause any supplemental tax assessments, or if the facilities in Lessee's Outside Exclusive Use Area utilize an excessive amount of utilities in relation to other tenants of the Project, Lessor may reasonably allocate to Lessee 100% of the supplemental tax assessments and/or excess utility costs.

(c)    "**Lessee's Pro Rata Share**" is agreed to be 61.00%.  If for any reason Lessor reasonably determines that any cost item should be equitably reallocated among tenants of the Project based upon their relative use or benefit, Lessor may make a reasonable adjustment to Lessee's Pro Rata Share with respect to such specific cost item.

(d)    Lessor shall be the "Insuring Party", and will maintain the insurance required or permitted in Paragraph 8.3 of the Lease.  Lessee shall reimburse to Lessor Lessee's Pro Rata Share of the cost of insurance maintained by Lessor under Paragraphs 8.1, 8.2(b) and 8.3.  In addition, if Lessee's particular and unique use of the Premises causes an increase or surcharge to the cost of any of such insurance maintained by Lessor, Lessee shall reimburse to Lessor 100% of such increase or surcharge.  Lessor's insurance costs as of the date of this Lease for the entire Building are estimated at $36,000 annually; provided, however, that this amount is Lessor's estimate only, and such estimate is subject to change and future increases during the Lease Term.

(e)    Lessor will be responsible for the following items, although Lessee shall reimburse Lessor for Lessee's Pro Rata Share of the entire cost of such items (without any amortization of such cost): (i) repair and replacement, as necessary, of any main utility lines servicing the Building (up to the point of connection with any distribution points in the Building); and (ii) any other items (which may include, without limitation, fire sprinkler systems or any other building systems) affecting the maintenance, repair or replacement of any portion of the Building or the Project that Lessor reasonably elects to take responsibility for (whether for efficiency, practicality or any other reasonable reason).  Notwithstanding the foregoing: (i) Lessee shall not be required to reimburse Lessee's Pro Rata Share of any of the foregoing maintenance, repair or replacement items that benefit another tenant of the Project exclusively; (ii) whenever Lessor determines that the roof of the Building requires replacement (which the parties acknowledge is estimated to occur during the initial term of this Lease), Lessor will contract for and install the new roof and the entire cost of such new roof (without amortization) will be payable two-thirds (2/3rds) by Lessee and one-third (1/3rd) by Lessor (the foregoing allocation of the cost of roof replacement is an agreed-upon allocation that overrides all other provisions of this Lease); and (iii) the parties acknowledge that amortization is required under this Lease only with respect to the cost of Capital Expenditures required by changes in Applicable Requirements, which are governed by Paragraph 2.3 of the Lease).

(f)    Lessee acknowledges and agrees that its responsibilities under Paragraph 7.1 of the Lease include all improvements and areas that are located within the Premises (i.e., including Lessee's leased portion of the Building and Lessee's Outside Exclusive Use Area) or that exclusively service the Premises.  By way of example (but without excluding or limiting any other items for which Lessee is responsible pursuant to Paragraph 7.1 or any other provisions of the Lease), Lessee will be responsible at its sole cost and expense (without reimbursement from Lessor and without any amortization of the cost thereof) for maintenance, repair and replacement of : (i) all HVAC units exclusively servicing the Premises, (ii) that portion of the roof which covers Lessee's portion of the Building (except that replacement of the roof shall be handled by Lessor and the cost thereof allocated between Lessor and Lessee in accordance with subparagraph (e) above), (iii) all plumbing facilities, electrical facilities, lighting facilities, restrooms, boilers, pressure vessels, fire protection or other life-safety systems and any other Building systems exclusively servicing the Premises (other than main utility lines as provided in subparagraph (e) above), (iv) all landscape, hardscape, fences (including the new fence in the rear loading area to be installed by Lessor), retaining walls, signs and any other improvements or facilities to the extent situated within Lessee's Outside Exclusive Use Area, and (v) any access gate regulating entry to Lessee's Access Road.  If any particular item of maintenance or repair



cannot be accomplished by Lessee on its own or by its nature needs to be coordinated with the other tenants of the Remaining Space, Lessor shall use commercially reasonable efforts to coordinate the Lessee's maintenance or repair of such item with such other tenants, and if Lessor must perform the maintenance or repair it shall equitably allocate the costs thereof between Lessee and such other tenants in proportion to the benefits received.

(g)     Lessee's obligations also include keeping the exterior of the Building outside its Premises in a first-class condition including, when necessary, exterior painting. Lessee acknowledges that Lessor has delivered the Building in first-class condition with a new, professionally applied exterior paint job, and that the "necessity" for future paint jobs shall be within time periods not less than every five (5) years and not to exceed every seven (7) years after the Commencement Date. Subject to the time periods in the preceding sentence, Lessor may elect to paint the exterior of the Building itself, in which case Lessee shall reimburse Lessor for Lessee's Pro Rata Share of the cost thereof.

(h)     Lessor may, at its option, (i) invoice Lessee for any out of pocket costs reasonably incurred by Lessor under Paragraph 7, Paragraph 50 or any other applicable Paragraph of the Lease as incurred, in which case Lessee shall pay the required amount stated in the invoice within thirty (30) days after receipt thereof, or (ii) estimate all or any portion of such costs owing by Lessee for the current calendar year in advance, and charge Lessee a pro rata share of such estimated amount monthly in advance (based on the remaining number of months in such calendar year), in which case Lessee shall pay such estimated amount each month together with and in the same manner as Base Rent. Lessor may adjust such monthly amount at any time based upon revisions to the projected costs for such calendar year. For any calendar year in which estimated payments have been made by Lessee, Lessor shall deliver to Lessee within one hundred twenty (120) days following the end of such calendar year a reasonably detailed reconciliation statement showing Lessee's actual cost obligation for such calendar year. If Lessee's total estimated payments made during the preceding year exceed Lessee's actual obligation as indicated on such statement, Lessor shall credit the amount of such over-payment against the next Base Rent payments owing by Lessee under this Lease. If Lessee's total estimated payments made during the preceding year were less than Lessee's actual obligation as indicated on such statement, Lessee shall pay to Lessor the amount of the deficiency within thirty (30) days after delivery by Lessor to Lessee of the statement. If the Lease expires or terminates before Lessor delivers such statement to Lessee, Lessor shall still be required to deliver such statement to Lessee within such one hundred twenty (120) day period, and Lessor or Lessee, as applicable, shall promptly pay to the other party any overpayment or underpayment, as applicable, by Lessee.

(i)     Lessee shall have the right to audit (as provided below) Lessee's books and records relating to any charges imposed by Lessor on Lessee pursuant to this Lease, including Paragraph 7 and Paragraph 50 of this Lease. Lessee shall have the right to conduct one audit during each calendar year, which audit must be held no later than (i) with respect to any charges attributable to any calendar year that are paid pursuant to the estimated monthly procedure described in subparagraph (h) above, the expiration of the six (6) month period following Lessee's receipt of Lessor's reconciliation statement for such calendar year, or (ii) with respect to any other charge invoiced in any other manner, the expiration of the six (6) month period following Lessor's delivery of the invoice to Lessee requesting payment of such charge. Lessee must give Lessor at least five (5) days' prior written notice of such audit. If Lessee gives a timely notice of audit, Lessor shall provide Lessee and its authorized representative, during normal business hours in a location designated by Lessor in Orange County, Los Angeles County or Riverside County, California, access to or copies of Lessor's books and records that pertain to the charges in question. Lessor will maintain reasonable books and records for any charges imposed on Lessee under this Lease for a period of two years after Lessee is invoiced for the same (or longer, as long as any dispute between Lessor and Lessee over the amount of such charges is pending). If the results of the audit show an overage of more than five percent (5%) of the actual amount owed by Lessee, then Lessor shall pay all of the costs incurred by Lessee in connection with such audit (up to, but not exceeding, a total cost of $1000.00). If the audit indicates an overpayment by Lessee, then Lessee shall be entitled, (i) if the Lease Term has not yet expired, to offset such excess against Base Rent payments becoming due under this Lease or any other payment obligations under this Lease, or (ii) if the Lease Term has expired, to receive



*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

a refund from Lessor within thirty (30) days after completion of such audit. The foregoing are the only audit rights that Lessee shall have with respect to charges imposed on Lessee pursuant to this Lease, and Lessee shall be deemed to have conclusively approved any charges if Lessee fails to request an audit in writing within the applicable time period described above (although Lessee shall retain the right to review records maintained by Lessor for earlier periods for purposes of comparison and interpretation of charges that are timely audited by Lessee).

51.   **Lessor's TI Work**: Lessor, at Lessor's sole cost and expense utilizing building standard materials (which are specified in Schedule 51 attached hereto), shall provide the following improvements to the Premises in accordance with the Work Schedule (collectively, the "**Lessor's TI Work**"):

(a)   Replace the carpet in the office portion of the Premises;

(b)   Repaint all painted surfaces in the restrooms and the office portion of the Premises;

(c)   Repaint all walls in the warehouse portion of the Premises, including the newly constructed demising wall;

(d)   Construct a new demising wall in the warehouse area to separate Lessee's Premises from the balance of the Building, which demising wall shall be full height (i.e., from floor to ceiling) and constructed out of 6-inch 16-guage studs, 16 inches on center, with two layers of 5/8 inch drywall on each side, and in compliance with City of Corona and other applicable requirements and laws;

(e)   Slurry, dowel and fill with concrete to the height of the existing slab that area underneath the existing computer room; and

(f)   Install the fence described in Paragraph 50(a) above.

Lessor's TI Work shall be constructed and installed in a good, workmanlike manner, utilizing only new materials. Lessor shall obtain for the benefit of Lessee, to the extent available and customary for such work, commercially reasonable warranties from the contractors with respect to Lessor's TI Work.

52.   **Tenant Improvement Allowance**:

(a)   Lessor shall provide Lessee with a tenant improvement allowance not to exceed $350,000 ("**Allowance**"), which will be repaid by Lessee as additional rent as provided below, for the actual costs incurred by Lessee to complete certain tenant improvements to the Premises at the beginning of the Lease Term that are reasonably acceptable to Lessor or otherwise approved under this Lease ("**Lessee's TI Work**"). The Allowance may be used for all costs incurred for construction, space planning, engineering, construction drawings, permits and licenses and similar costs with respect to Lessee's TI Work, and shall include a two percent (2%) supervision fee (not to exceed $7,000) payable to Lessor for its oversight of Lessee's TI Work. The Allowance may not be used for the cost of Lessee's telcon and data cabling, or Lessee's furniture, equipment or other personal property.

(b)   Lessor shall allow Lessee to use its choice of contractor(s) for the construction of the improvements (subject to Lessor's reasonable approval of the items described in subparagraph (c)(i) below).

(c)   Lessee shall provide Lessor prior to commencing construction of the Lessee's TI Work:

(i)   Contractor package including qualifications, proof of licensing in the State of California, proof of proper insurance coverage and bonding capacity including certificates of insurance for general liability and workman's comp issued in favor of Lessor and Dolphin Partners, Inc.;



W97-OC:NAB\41298875.9                                     -9-

*NCA*

*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

      (ii)     Copies of construction drawings; and

      (iii)    Copies of all permits and licenses that are legally required.

  (d)    Lessee shall provide Lessor upon the completion of the Lessee's TI Work:

      (i)   . Copies of all lien releases;

      (ii)     Copies of paid invoices applicable to the Lessee's TI Work; and

      (iii)    Final as-built plans with respect to the Lessee's TI Work.

    (e)    In order to qualify to receive the Allowance, Lessee must provide to Lessor, no later than the end of the sixth (6th) month following the Commencement Date, written notice of the exact amount of the Allowance that Lessee desires to utilize together with a written description of the work that Lessee intends to fund with the Allowance and approximate cost amounts for each work item. Lessor will fund the Allowance (or portion thereof that is designated by Lessee as aforesaid) to Lessee in one lump-sum payment upon the earlier of (i) the first day of the month following the actual completion of Lessee's TI Work, or (ii) the end of the sixth (6th) month following the Commencement Date (whether or not the Lessee's TI Work is then completed).

    (f)    Lessee shall use commercially reasonable efforts to complete the Lessee's TI Work no later than two hundred seventy (270) days following the Commencement Date, or as soon thereafter as is reasonably possible (although such completion is not a condition to rent owing hereunder or to Lessor's obligation to fund the Allowance).

    (g)    The portion of the Allowance actually paid by Lessor to Lessee shall be repaid to Lessor by Lessee, in monthly installments as additional rent (which shall be paid at the same time and in the same manner as monthly payments of Base Rent), amortized over the remaining Lease Term on a straight line basis assuming an 8.25% cost of funds. Such amortization (and Lessee's obligation to pay monthly installments of additional rent under this Paragraph) shall commence upon the earlier of (i) the first day of the month following the actual disbursement of the Allowance, or (ii) the first (1st) day of the seventh (7th) month following the Commencement Date.

53.   **First Right of Refusal – Expansion in the Building**:

    (a)    During the initial term of the Lease only, Lessee shall have a first right of refusal (on the terms provided below) to lease the entire remaining space ("**Remaining Space**") in the Building.

    (b)    The right of first refusal to lease shall be exercised exclusively as follows:

      (i)    If Lessor receives a bona fide offer (which may also be in the form of a letter of intent or term sheet) (an "**Offer to Lease**") to lease all or part of the Remaining Space from any third party unaffiliated with Lessor, and Lessor desires (in its sole discretion) to accept such Offer to Lease, then prior to leasing the applicable portion of the Remaining Space to such third party, Lessor shall first provide Lessee with a copy of such Offer to Lease, together with a description of the proposed use, which delivery shall constitute an offer from Lessor to Lessee on the terms stated in the Offer to Lease.

      (ii)    Lessee shall have ten (10) business days after receipt of the Offer to Lease within which to deliver to Lessor an unconditional acceptance in writing of the terms stated in such Offer to Lease. If Lessee fails to deliver to Lessor an unconditional written acceptance as required above within such ten (10) business day period, Lessee shall be conclusively deemed to have rejected the Offer to Lease.

      (iii)    If Lessee delivers to Lessor an unconditional written acceptance as required above within such ten (10) business day period, Lessor shall promptly prepare and deliver to Lessee a formal written amendment to the Lease which contains only the terms set



forth in the Offer to Lease), and Lessee shall sign and return such amendment to Lessor within five (5) business days after receipt thereof. Neither party shall have any express or implied obligation to accept any additional or different terms or conditions not set forth in the Offer to Lease. If Lessee fails to execute and return the Lease amendment prepared by Lessor (provided that it contains only the terms set forth in the Offer to Lease) within such five (5) business day period, Lessor may in its sole discretion either enforce the Offer to Lease against Lessee or terminate Lessee's acceptance of the Offer to Lease, in which case Lessee shall be conclusively deemed to have rejected the Offer to Lease.

(iv)     If Lessee rejects the Offer to Lease, or is deemed to reject the Offer to Lease as provided above, then Lessor shall have a period of eight (8) months thereafter within which Lessor shall be free to lease the Remaining Space to the specific maker of the Offer to Lease or to any affiliate thereof (collectively, the "**Lease Offeror**"), on any terms and conditions that are agreeable to Lessor in its sole discretion (whether more or less favorable than the terms set forth in the Offer to Lease), with no further obligation or liability to Lessee except that, if Lessor is unable to execute a lease with the Lease Offeror within such eight (8) month period, then Lessor must again repeat the above procedure prior to accepting an offer to lease.

(v)     Lessee acknowledges that Lessee's rights under this Paragraph will materially impact Lessor's ability to market the Remaining Space for lease, and agrees (i) that time is strictly of the essence with respect to each time period stated above, and (ii) to provide Lessor at any time upon demand following the expiration of any applicable time period above with written acknowledgment that Lessee's rights under this Paragraph with respect to such Offer to Lease have terminated.

(c)     Notwithstanding anything in this Paragraph to the contrary, Lessee's rights under this Paragraph shall not apply with respect to any extension or renegotiation of an existing lease, or negotiation of a new lease, with any then current occupant of the Remaining Space.

(d)     The rights granted to Lessee under this Paragraph shall be deemed an "Option" and subject to the provisions of Paragraph 39 of the Lease.

54.     **First Right of Refusal – Sale of Vacant Parcel**:

(a)     During the initial term of the Lease only, Lessee shall have a first right of refusal (on the terms provided below) to purchase the Adjacent Vacant Parcel.

(b)     The right of first refusal to purchase shall be exercised exclusively as follows:

(i)     If Lessor receives a bona fide offer, letter of intent or term sheet to purchase the Adjacent Vacant Parcel (collectively, an "**Offer to Purchase**") from a third party unaffiliated with Lessor, and Lessor desires to accept such Offer to Purchase, then prior to accepting such Offer to Purchase Lessor shall first provide Lessee with a copy of such Offer to Purchase.

(ii)     Lessee shall have ten (10) business days after receipt of such Offer to Purchase within which to deliver to Lessor a written notice of its desire to purchase the Adjacent Vacant Parcel on the terms stated in the Offer to Purchase. Lessee shall then have twenty (20) additional days to complete its review of and execute a purchase and sale agreement prepared by Lessor. Except to the extent different terms are specified in the Offer to Purchase, such purchase and sale agreement shall (i) require an all-cash purchase price payable at the closing, (ii) provide for the opening of a sale escrow with Chicago Title Company or other national title company designated by Lessor ("**Title Company**"), (iii) require each party to execute normal and customary escrow instructions necessary to close the escrow, (iv) require Seller to provide Lessee upon execution of the purchase and sale agreement with a commitment from Title Company for a standard owner's policy of title insurance, insuring fee title to the Premises vested in Lessee, subject to easements, reservations of subsurface mineral rights, and other restrictions of record or that would be disclosed by an ALTA survey, but in no event subject to any mortgages or other monetary liens or charges (other than any mortgage in connection with Lessee's financing of the purchase price), and at closing to provide Lessee with the foregoing described title policy at Lessee's expense with no new material adverse exceptions not in the



commitment, (v) require closing to take place within thirty (30) days of the opening of escrow, (vi) require Seller to pay the cost of any local transfer taxes, and each party to pay one-half of any escrow fee, with any other closing costs to be paid in accordance with local custom (except that each party will pay its own attorney fees), and (vii) provide that Lessee shall acquire the property "AS-IS," "WHERE-IS" and "WITH ALL FAULTS", without any express or implied representations or warranties of any type or nature, including the implied warranties of merchantability and fitness for a particular purpose. Lessee shall have the same due diligence period that is provided for in the Offer to Purchase.

(iii) If (i) Lessee does not deliver the written notice required above within the ten (10) business day period stated above, or if Lessor and Lessee are unable for any reason to agree on and execute Lessor's purchase and sale agreement within the twenty (20) day period stated above, Lessor shall have a period of eight (8) months within which Lessor shall be free to sell the Adjacent Vacant Parcel to the specific maker of the Offer to Purchase or to any affiliate thereof (collectively, the "**Sale Offeror**"), on any terms and conditions that are agreeable to Lessor in its sole discretion (whether more or less favorable than the terms set forth in the Offer to Purchase), with no further obligation or liability to Lessee, except that, if Lessor is unable to complete a sale with the Sale Offeror within such eight (8) month period, then Lessor must again repeat the above procedure prior to selling the Adjacent Parcel.

(iv) Lessee acknowledges that Lessee's rights under this Paragraph will materially impact Lessor's ability to market the Adjacent Vacant Parcel for sale, and agrees (i) that time is strictly of the essence with respect to each time period stated above, and (ii) to provide Lessor at any time upon demand following the expiration of any applicable time period above with written acknowledgment that Lessee's rights under this Paragraph with respect to such Offer to Purchase have terminated.

(c) The rights granted to Lessee under this Paragraph shall be deemed an "Option" and subject to the provisions of Paragraph 39 of the Lease.

55. **Options to Extend**:  Lessor hereby grants to Lessee the option to extend the term of the Lease for three (3) consecutive five (5) year periods (each, an "**Extension Option**"), commencing upon the expiration of the initial Lease Term or extended Lease Term, as applicable, upon each and all of the following terms and conditions:

(a) The rights granted to Lessee under this Paragraph shall be deemed an "Option" and subject to the provisions of Paragraph 39 of the Lease.

(b) Each Extension Option shall be exercised by Lessee or a Permitted Transferee exclusively by giving to Lessor, no sooner than two hundred seventy (270) days and no later than one hundred eighty (180) days prior to the date that the applicable option period would commence (if exercised), a written notice in accordance with Paragraph 23 of the Lease of Lessee's unconditional exercise of such Extension Option.  If an Extension Option is not exercised strictly as provided above, then that Extension Option and any subsequent Extension Options shall automatically terminate.

(c) All of the terms and conditions of the Lease (as modified by this Addendum) shall apply to each such option term, other than (i) Base Rent which shall be adjusted as provided below, (ii) any obligations of Lessor relating to tenant improvements or allowances therefor, and (iii) options to extend under this Paragraph (which may only be exercised once).

(d) The monthly Base Rent payable at the commencement of each option term shall be the then fair market monthly Base Rent for the Premises (as determined below), but in no event less than the Base Rent in effect under the Lease in the month immediately preceding the first month of such option period.  In determining "fair market" base rent, the parties and any brokers retained as provided below shall determine the annual base rent amount per rentable square foot that a willing, comparable, unaffiliated lessee would pay and a willing, comparable, unaffiliated lessor would accept for similar space in a similar type of project and building (which similar space must be a corporate headquarters facility with a significant office component and parking and upgrades similar to the Premises) in an arm's length transaction.  Comparables shall

*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

be limited to Riverside County and Orange County, California, and shall focus on comparable tenants and projects (as described above), with appropriate adjustments for any differences in property condition and geographic area that would affect rental rates for comparable tenants and projects. Further, comparisons shall be limited to base rent, without adjustment for other concessions. Such fair market base rent shall be the fair market base rent in effect as of the beginning of each applicable option period, even though the determination may be made in advance of or after that date, and the parties may use recent trends in rental rates in determining the proper fair market base rent as of the beginning of each option period. Lessee shall not be entitled to any tenant improvement or refurbishment allowance by virtue of any exercise of an option to extend.

(e)      The procedure for determining the fair market rent shall be as follows (with the parties and any selected brokers being bound by the standards stated in subparagraph (d) above and all other requirements of this Paragraph 55):

(i)      If Lessee exercises an option to extend, then the parties shall attempt to agree in writing upon the monthly Base Rent for the initial year of the option term. If the parties are unable to agree on the monthly Base Rent in writing within thirty (30) days following Lessor's receipt of Lessee's written exercise, then such amount shall be determined as provided below.

(ii)      Within fifteen (15) days after the expiration of such thirty (30) day period, each party shall appoint a duly qualified commercial real estate broker, who has at least five years experience specializing in the leasing of commercial/industrial space within the city or county in which the Premises are located. Within fifteen (15) days thereafter, the two brokers so appointed shall either (i) mutually agree in writing as to the fair market monthly Base Rent for the initial year of the option term, or (ii) appoint a third commercial real estate broker meeting the qualifications stated above, and who is independent and has no current, continuing or otherwise significant personal or business relationship with either Lessor or Lessee. If the two brokers appointed by the parties are unable to agree on the third broker, then the parties hereto shall jointly apply to the governing board of the local AIR organization for the appointment of such third broker. Within thirty (30) days after appointment of the third broker, the three brokers shall attempt to determine the fair market monthly Base Rent for the initial year of the option term. If the brokers are unable to reach a unanimous agreement, the vote of two shall control and the decision of the brokers shall be final and binding upon the parties hereto. If no two of the brokers are able to reach an agreement, each of the brokers shall submit in writing a proposed fair market rent. The two proposals that are closest to each other in amount shall be averaged together, and the averaged amount shall be the fair market monthly Base Rent for the initial year of the option term and shall be final and binding on the parties hereto. Lessor and Lessee shall each bear the entire cost of the broker appointed by it, and one-half of the cost of the third broker and any other costs of the process.

(iii)      If for any reason the monthly Base Rent to be paid during the initial year of the option term is not determined by the commencement of the option term, Lessee shall continue paying to Lessor the rent in effect immediately prior to the commencement of the option term. Upon determination of the new monthly rent, Lessee shall either pay to Lessor with the next rent check, or receive a credit against the next rent check, in the amount of the underpayment or overpayment during the period from the commencement of the option term to such payment.

(iv)      The monthly Base Rent during each option period shall initially be the amount determined pursuant to the procedure described above. Such amount shall automatically increase at the end of each thirty (30) month period during the option term (each, a "**Measuring Period**"), by the greater of (i) a two and one-half percent (2-1/2%) increase for each of the first two twelve (12) month periods in the Measuring Period and a one and one-quarter percent (1-1/4%) increase for the remaining six (6) month period in the Measuring Period, or (ii) an increase that is proportionate to the increase (if any) in the Consumer Price Index (as defined below) during such Measuring Period; provided, however, that such increase shall not exceed a six percent (6%) increase for each of the first two twelve (12) month periods in the Measuring Period and a three percent (3%) increase for the remaining six (6) month period in the Measuring



*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

Period. All such increases during the option period shall be computed on a cumulative and compounding basis per annum. As used herein, "**Consumer Price Index**" shall mean the United States Department of Labor, Bureau of Labor Statistics, Consumer Price Index of ALL ITEMS -- ALL URBAN CONSUMERS, Los Angeles-Anaheim-Riverside (Base 1982-1984=100). If the base year is changed, the Consumer Price Index shall be converted in accordance with the conversion factor published by the United States Department of Labor, Bureau of Labor Statistics. If, for any reason, there is a major change in the method of calculation or formulation of the Consumer Price Index, or the Consumer Price Index is no longer published, then Lessor and Lessee shall mutually select such other commodity index that produces substantially the same result as would be obtained if the Consumer Price Index had not been discontinued or revised. If the parties are unable to agree upon a successor index, they shall refer the choice of the successor index to arbitration in accordance with the rules of the American Arbitration Association.

56.     **Additional Lessee Charges**: Lessee shall be responsible for the payment of Lessor's property management/supervision fee equal to two percent (2%) of gross monthly Base Rent. Said amount shall be in addition to and due with Lessee's monthly payment of Base Rent.

57.     **Installation by Lessee of a New Electrical Distribution Panel For Remaining Space**: Lessee shall have the exclusive use of (and exclusive responsibility for) the existing 4,000 amp electrical service to the Building which is located in the Premises. Lessee acknowledges that this will result in a considerable cost savings to Lessee, and that a new power source will be needed for the Remaining Space. In consideration thereof, Lessee shall be responsible for the cost of a new primary electrical distribution panel including a 2,000 amp service metered by the utility provider for the Remaining Space. Lessee's obligation shall include, but not be limited to, (i) all costs for appropriate distribution, conduit and enclosure and vault construction, (ii) all costs to connect the new panel to all existing lighting and existing secondary power panels for the Remaining Space, and (iii) all costs for design, engineering, permit and inspection fees, utility company connection fees and installation. Lessor shall retain Lessor's contractor to install the required facilities. At Lessor's option, Lessee shall pay the contractor directly, or shall reimburse Lessor, in each case within ten (10) business days following receipt of a written invoice or invoices therefor. At Lessee's discretion, all or a portion of the Allowance may be applied towards such obligation.

58.     **Emergency Back-Up Generator**: The parties acknowledge that there currently exists an emergency back-up generator for the Premises. Lessor will deliver the generator unit to Lessee on the Commencement Date in good working condition (reasonable wear and tear excepted) and with new batteries, although Lessee accepts the distribution system connected to such generator unit in its existing as-is condition. Lessee has elected to use and be responsible for such generator, on the following terms (except as specifically provided otherwise in this Paragraph): (i) such election shall be irrevocable, (ii) Lessee shall accept the generator in its then existing "as-is", "where-is" condition, (iii) Lessee, throughout the remaining Lease Term (including any extensions thereof) shall have sole responsibility at Lessee's expense for the operation, use, maintenance and repair of the generator in accordance with Paragraph 7.1 of the Lease, and (iv) upon the expiration or earlier termination of the Lease, Lessee shall return to Lessor the back-up generator in good working condition (reasonable wear and tear excepted). Notwithstanding the above, if during the Term any Applicable Requirements or orders of governmental or quasi-governmental authorities would require Lessee to upgrade the generator system or to alter or improve the Premises in order to continue using the generator, then Lessee may, at its sole option, either comply with such requirements or notify Lessor in writing that Lessee elects to return the generator to Lessor. If Lessee so elects to return the generator to Lessor, then Lessee shall have no further rights or obligations with respect to the generator (other than to return it to Lessor in good working condition, reasonable wear and tear excepted), although Lessee shall permit the generator to remain in place and shall permit Lessor throughout the Lease Term to enter upon the Premises (in accordance with Paragraph 6.4 above) to operate and maintain the generator on a periodic basis so as to maintain the generator in good working order.

59.     **Seismic**: Lessor shall deliver the Premises in compliance with any and all seismic requirements currently in effect as of the Commencement Date under applicable local, State or Federal statutes, codes or regulations as then applied by governmental authorities having


W97-OC:NAS\41298875.9                         -14-

*nß*

*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

jurisdiction, to the extent that such requirements are applicable to general occupancy of the Premises for general light manufacturing, warehouse, distribution or similar light industrial uses. Lessor shall not be responsible under any circumstances for seismic upgrades required as a result of Lessee's specific and unique occupancy and use of the Premises, and Lessee shall be required to comply with any such requirements at its own cost and expense. Any seismic upgrades that may be required by new or changed Applicable Requirements after the Commencement Date shall be governed by Paragraph 2.3 of the Lease.

60.     **Sale of Building**: Lessor will provide Lessee with written notice during the initial Lease Term if Lessor decides to market the Building for sale or to entertain any unsolicited offers to purchase. Lessee understands that this is a notice provision only and that it is not intended to and shall not create any express or implied option, right of first refusal, right of first offer, or any other preferential right. Further, Lessor shall have no obligation to disclose to Lessee the terms of any proposed offer to purchase.

61.     **Furniture**: Upon the Commencement Date of this Lease, the Premises contains modular and other office furniture that is available to Lessee for its use during the initial Lease Term and any extensions thereof. Lessee accepts the Premises with this modular and other furniture in-place. Lessee has no obligation to return the modular or other furniture to Lessor at any time during the Lease Term or upon expiration or termination of same. Lessee may dispose of all or any portion of such furniture at any time during the Lease Term.

62.     **Americans with Disabilities Act**: Notwithstanding anything in the Lease to the contrary, and to Lessor's actual knowledge, Lessor represents and warrants to Lessee that, as of the Commencement Date, the Premises shall be in compliance with all of the requirements of the Americans with Disabilities Act ("**ADA**") and Title 24 of the California Administrative Code (i.e., state building code) that are as of the Commencement Date applicable to general occupancy of the Premises for general light manufacturing, warehouse, distribution or similar light industrial uses (but Lessor does not warrant compliance with respect to Lessee's specific and unique use of or alterations to the Premises). Lessee agrees that it shall be solely responsible for any and all costs of any ADA required improvements to the Premises that are required at any time as a result of Lessee's specific and unique occupancy or use of the Premises, or that are triggered by Lessee installed improvements (including the Lessee's TI Work, whether or not funded by the Allowance, but excluding the Lessor's TI Work). Any ADA required improvements to the Premises resulting from a change in ADA requirements enacted or implemented after the Commencement Date shall be governed by Paragraph 2.3 of the Lease (unless Lessee is responsible for such improvements under the immediately preceding sentence, in which case the immediately preceding sentence shall govern).

63.     **Outdoor Testing Facility**: Lessee shall have the right to construct at its sole cost and expense an outdoor testing facility, subject to all requirements of this Lease (other than any requirement that Lessor consent to such a facility, which consent is hereby given by Lessor). Lessor acknowledges that the outdoor testing facility is an integral part of Lessee's intended operations at the Premises. Such facility shall be constructed by Lessee in compliance with all Applicable Requirements, by a contractor reasonably approved by Lessor, and pursuant to construction drawings reasonably approved by Lessor. Such outdoor testing facility shall not unreasonably interfere with any other tenant's use and enjoyment of its premises in the Building (except that the Parties acknowledge that the foregoing restriction is made with the intention that Lessor will lease the Remaining Space for uses that are typical for industrial buildings, such as manufacturing, warehouse, distribution or similar uses, as contrasted with non-typical uses such as professional offices or a church). Lessee shall have sole responsibility for such outdoor testing facility in all respects. Upon the expiration or earlier termination of this Lease, Lessee at its sole cost and expense shall remove such facility, repair any damage caused by such facility and restore the affected area of the Premises to the same condition that existed prior to installation of such facility.

64.     **Specific and Unique Use – Interpretation**: Whenever the phrase "Lessee's specific and unique use", or variation thereof, is used in this Lease, such phrase shall be interpreted to mean any and all uses by Lessee other than uses that are generally applicable to all manufacturing, warehouse, distribution or similar industrial uses. By way of example (although the following is


W97-OC:NAB\41298875.9

*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

not intended to constitute a complete or exhaustive list of examples), any requirements or charges imposed upon the Premises as a result of (i) Lessee's use of particular Hazardous Substances in the Premises, (ii) Lessee's intensity of use of the Premises, Lessee's particular type or number of employees utilized at the Premises, or Lessee's particular manufacturing, testing or other operations at the Premises, (iii) federal or other governmental laws and regulations that are applicable to parties who enter into government contracts, or (iv) any alterations to the Premises made by or for Lessee (including the Lessee's TI Work, whether or not funded by the Allowance, but excluding the Lessor's TI Work), shall be deemed to be a result of Lessee's "specific and unique" use of the Premises.

65.     **Rules of Construction**.  When used in this Lease, the term (i) "**include**" means "include but are not limited to", (ii) "**includes**" means "includes but is not limited to", and (iii) "**including**" means "including, but not limited to".  All references to "**days**" in this Lease shall mean calendar days, unless otherwise provided.  All references in this Lease to the "**term**" of this Lease" or the "**Lease Term**" shall mean the initial term, and any extensions or renewals thereof (and, for purposes of Lessee's indemnification obligations and other liabilities under this Lease, any period of holdover by Lessee beyond the scheduled term).

In Witness Whereof, the parties hereto have executed this Addendum to Standard Industrial/ Commercial Single Tenant Lease -- Net as of the date set forth below:

"LESSOR"                                    "LESSEE"

Corona Dolphin, LP, a California limited     Smiths Aerospace, Inc., a Delaware
partnership                                  corporation

By:     Yellowfin Equities, LP, a California
        limited partnership, its General Partner

                                        By: _____
    By: Dolphin Partners, Inc., a California       Robert F. Ehr, President, Electronic
        corporation, its General Partner           Systems

    By: _____       By: _____
        _____           Ronald C. Albrecht, Vice President,
        [Printed Name and Title]             U.S. Operations, Electronic Systems

Dated as of February 1, 2003                 Dated as of February 1, 2003

*Addendum to Standard Office Lease by and between*
*Corona Dolphin "Lessor" and Smiths Aerospace "Lessee."*

## EXHIBIT A

Site Plan



Second Floor

550 Monica Circle, Corona, CA

**SITE PLAN**

PREMISES

LOCATION OF FENCE

LESSEE'S OUTSIDE
EXCLUSIVE USE AREA

VACANT
USE AREA

Monica
Circle

VACANT SPACE

SMITH'S ACCESS
ONLY

**3.72 Acres**
ADJACENT
VACANT PARCEL

W97-OC:NABM1298875.6

**EXHIBIT "A"**



**EXHIBIT B**

 CT Corporation

**Service of Process Transmittal**
02/20/2014
CT Log Number 524442601

TO:     Breck Weigel MD J104
        GE Aviation
        One Neumann Way
        Cincinnati, OH 45215

RE:     **Process Served in California**

FOR:    GE Aviation Systems LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Corona Dolphin, L.P., etc., Pltf. vs. GE Aviation Systems, LLC, etc., et al., Dfts. Name discrepancy noted. |
| **DOCUMENT(S) SERVED:** | Summons, Certificate, Cover Sheet, Notice, Demands, Prayer, Exhibit |
| **COURT/AGENCY:** | Riverside County - Superior Court - Riverside, CA Case # RIC1401377 |
| **NATURE OF ACTION:** | Breach of Written Lease |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 02/20/2014 at 15:30 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | 30 days after this summons and legal papers are served on you (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Gary J. Gorham<br>Richardson & Patel, LLP<br>1100 Glendon AVenue<br>Suite 850<br>Los Angeles, CA 90024<br>310-208-1182 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 02/21/2014, Expected Purge Date: 02/26/2014<br>Image SOP<br>Email Notification, Breck Weigel MD J104 breck.weigel@ge.com<br>Email Notification, Shawn Kauffman shawn.kauffman@ge.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>Nancy Flores<br>818 West Seventh Street<br>Los Angeles, CA 90017<br>213-337-4615 |

Page 1 of  1 / CL

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

FEB 2 0 2014 @ 3:30

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**

GE AVIATION SYSTEMS, LLC, a Delaware limited liability company;
DOES 1 through 20, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

CORONA DOLPHIN, L.P., a California limited partnership,

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

**FEB 13 2014**

R. Mc Elyea

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
(El nombre y dirección de la corte es:)  Riverside County Superior Court

Riverside Court: 4050 Main Street, Riverside, CA 92501

CASE NUMBER:
(Número del Caso): **RIC 1401377**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es:)
Gary J. Gorham, Richardson & Patel, LLP, 1100 Glendon Ave., Ste. 850, L.A., CA 90024 (310) 208-1182

DATE:
(Fecha)  **FEB 13 2014**

Clerk, by **R. Mc Elyea** , Deputy
(Secretario) (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☒ on behalf of (specify): *GE AVIATION SYSTEMS, LLC, a Delaware limited liability company*

under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☒ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)

☐ other (specify):

4. ☒ by personal delivery on (date): **FEB 2 0 2014**

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov